JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Romel Martin, appeals from a judgment of the Cuyahoga County Court of Common Pleas finding him guilty of aggravated robbery, felonious assault, and having a weapon while under a disability. Finding no merit to the appeal, we affirm.
 {¶ 2} On February 20, 2007, the Cuyahoga County Grand Jury indicted Martin on two counts of aggravated robbery, in violation of R.C. 2911.01, with one-and three-year firearm specifications; two counts of felonious assault, in violation of R.C. 2903.11, with one-and three-year firearm specifications; and one count of having a weapon while under a disability, in violation of R.C. 2923.13. Martin entered a plea of not guilty to the charges.
 {¶ 3} Martin waived his right to a jury trial on count five (having a weapon while under a disability) and thus, it was tried to the court. The remaining counts were tried to a jury, where the following evidence was presented at trial.
 {¶ 4} The victim, Kenneth Sims, testified that in the early morning hours of September 25, 2006, he was walking home from the store when a car pulled up beside him with three men in it. He knew two of the men in the car because he had gone to school with them; Martin and his brother, Jojwan. Jojwan got out of the car first and said, "What's up, Kenneth?" Sims said that Jojwan then got *Page 2 
back into the car, and that is when Martin approached him and said, "What's up, Kenneth?"
 {¶ 5} At first, Sims said he did not think anything was going to happen because he "knew these guys." But then Martin "pulled a gun out," and ordered Sims to give him everything he had. Sims asked Martin, "You serious?" Martin began patting down Sims' left side. As Martin attempted to pat down the right side of Sims' body, "where [Sims] had [his] weapon," Sims testified that he grabbed Martin's "hand and gun" and they started "tussling." Martin "yanked back and the gun slipped out of [Sims'] hand," and that is when Martin shot Sims two times. Sims said he "ran back" and shot once (with his gun), and that is when Martin shot him a third time. Sims stated that Martin shot him in the left forearm, his left side, and his right knee.
 {¶ 6} Sims explained that someone had just given him the gun. He felt he needed it because he had heard "a lot of stuff happening in the hood and [he] was just scared." So he got the gun to defend himself.
 {¶ 7} Sims said that after Martin shot him, Martin got back in the car and the three men fled in the car. Sims explained that Martin did not actually take any of his property.
 {¶ 8} Sims ran up the street, and called for an ambulance. When police officers arrived on the scene, he told them what happened; that he had been shot *Page 3 
by Martin. In addition, while he was still in the hospital, he said a detective showed him a photo array of six men and he chose Martin as the man who shot him. Sims then identified Martin in court.
 {¶ 9} On cross-examination, Sims admitted that he originally told Officer Cunningham that he noticed the gun while Martin was patting him down, not before, as he testified on direct. He was further questioned, "[w]ell, why would you tell Officer Cunningham a different story at the very time that it took place?" Sims replied, "[i]t happened so quick and I really don't remember, it happened so quick."
 {¶ 10} Sims also explained that this was the first time he had ever carried a gun and the first time he had even shot a gun. He denied knowing what happened to the gun, and further denied telling Officer Cunningham that he gave the gun to someone named James. Sims also stated that he did tell Officer Cunningham from the very beginning that he had shot Martin.
 {¶ 11} Sims admitted on further cross-examination that he was afraid of Martin as soon as he saw him, "before [Martin] approached [him]." He agreed that he testified on direct that he was not afraid at first, because he knew Martin.
 {¶ 12} On redirect-examination, Sims explained that he was afraid of "the two brothers" because he had heard "a lot of stuff about them." *Page 4 
 {¶ 13} Officer Kyle Cunningham, an East Cleveland Police Officer, testified that he was on routine patrol on the night in question. He received a call that shots had been fired in the area of Hayden and Alder, and that there was a possible victim. He and his partner arrived at the scene and, although they saw blood on the sidewalk, they did not see anyone there. They then received a second call that there was a victim at Hayden and Mann. When they arrived, they observed a black male "sitting on the stoop real nervous, crying, stating that he had been shot."
 {¶ 14} Officer Cunningham explained what Sims told him that night when he went to see him in the hospital:
 {¶ 15} "[Sims] said that he was walking back to the store and as he was returning back to his house a vehicle pulled up next to him and it was Jojwan who was speaking to him first. He got out, shook his hand, greeted him. * * * He stated that * * * he's scared of [Jojwan] because he had heard that they were out robbing people. At that particular time, he said Jojwan got back in the car. Martin approached him with a handgun in his hand and asked him what * * * did he have in his pockets and patted his pockets down. He said he was scared he was gonna get shot, so he grabbed the barrel of the gun and the two wrestled over the gun. At that particular time he said his hand slipped from the weapon and he was shot approximately — he said twice at first." *Page 5 
 {¶ 16} Officer Cunningham testified that Sims did not tell him during the initial conversation (before he was taken to the hospital) that he had shot Martin too.
 {¶ 17} Later at the hospital, Officer Cunningham learned from a Cleveland police officer that they were there because they were also investigating a report of a victim with a gunshot wound. The victim was Martin. Martin ended up being in the hospital bed beside Sims. After obtaining this information, Officer Cunningham asked Sims if he had shot Martin, in addition to being shot himself, and Sims admitted that he did.
 {¶ 18} Officer Cunningham then interviewed Martin. He said that Martin gave him a false name at first, but he learned who Martin was from his mother. After he learned Martin's real name, Officer Cunningham asked him where he received his injuries and Martin told him at "123rd and Saywell," which is in Cleveland, not East Cleveland. Martin told Officer Cunningham that he was not involved in the incident with Sims in East Cleveland.
 {¶ 19} On cross-examination, Officer Cunningham explained that Sims told him that he had given his gun to a man named James, who was "from the neighborhood." But the police never found a man named James nor the gun. Officer Cunningham also said, after reviewing his report, that Sims had originally told him that Martin had pulled the gun out "as he was patting [Sims] down," not before Martin approached him. *Page 6 
 {¶ 20} Officer Cunningham further agreed that he examined the "blood splatter" that was on the ground, but admitted that he did not have experience or training in doing so. He said that he did not collect any blood from the scene, and agreed that no blood was taken from the victim or Martin to compare the blood.
 {¶ 21} Officer Michael Cox, a Sixth District Cleveland Police Officer, testified that he responded to a call from Huron Hospital regarding a victim with a gunshot wound. The victim was Martin. Martin told Officer Cox that he had gotten off of a bus at "123rd and Saywell" and started walking. Martin said that he noticed three men following him. The three men approached him, and one of them "brandished a firearm and told him to lay it down." Martin said that he had grabbed the man's gun, and in the process, he was shot. Martin further told Officer Cox that he began running, and was hit by two more gunshots.
 {¶ 22} Officer Cox explained that Cleveland police did not receive any reports that evening of gunshots being fired in the area of "123rd and Saywell." He also testified that he went to the area where Martin claimed he had been shot and did not find any evidence that a shooting had taken place there; no blood stains or shell casings.
 {¶ 23} Detective Henry George Peter McCurdy of the East Cleveland Police Department testified that he received the case on the morning after it happened. *Page 7 
He showed a photo array containing Martin's photo to Sims and Sims identified Martin as the man who "had shot him three times."
 {¶ 24} On cross-examination, Detective McCurdy admitted that he did not go to the scene of the crime and collect evidence; shell casings, or swabs of blood. He explained that unless they are investigating a homicide, East Cleveland detectives do not collect evidence at the scene of a crime because "the patrol division who arrives on the scene" gathers that evidence. He agreed that Officer Cunningham "was wrong," if he testified that it was not his job to take blood samples.
 {¶ 25} Detective McCurdy also explained that he did not conduct a gun residue test because, by the time he received the case, the results would have been corrupted. He admitted that "[t]here was no physical evidence" in this case beyond "the man that was in the hospital shot three times."
 {¶ 26} At the close of the state's case, Martin moved for a Crim. R. 29 acquittal, which the trial court denied. Martin did not present any witnesses, but jointly submitted Sims' and Martin's medical records from Huron Hospital.
 {¶ 27} The jury found Martin guilty of both counts of aggravated robbery and both counts of felonious assault, and found that he did have a firearm as to each specification. The trial court found Martin guilty of having a weapon while under a disability. *Page 8 
 {¶ 28} The trial court sentenced Martin to four years on each count of aggravated robbery, four years on each count of felonious assault, and two years for having a weapon while under a disability, and ordered that they be served concurrently to one another, and consecutive to three years on the firearm specifications, for an aggregate prison term of seven years. Postrelease control was also part of Martin's sentence.
 {¶ 29} It is from this judgment that Martin appeals, raising two assignments of error for our review:
 {¶ 30} "[1.] Appellant's convictions for aggravated robbery, felonious assault and having a weapon while under disability were against the manifest weight of the evidence.
 {¶ 31} "[2.] The trial court erred in refusing to allow the use of a misdemeanor conviction as impeachment evidence."
 {¶ 32} In his first assignment of error, Martin argues that his convictions were against the manifest weight of the evidence. Specifically, he argues that (1) the victim, who was the sole eyewitness to the events, gave conflicting information to police officers at the time of the incident; (2) the victim lacked credibility and reliability; and (3) there was no corroborating evidence, such as other witnesses, blood samples, shell casings, or a handgun.
 {¶ 33} In evaluating a challenge on the verdicts based on manifest weight of the evidence, the Ohio Supreme Court declared: *Page 9 
 {¶ 34} "[a]lthough a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. * * * Weight of the evidence concerns `the inclination of thegreater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief (Emphasis added.) Black's, supra, at 1594.
 {¶ 35} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. * * * (The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence *Page 10 
weighs heavily against the conviction.')." (Internal citations omitted.)State v. Thompkins (1997), 78 Ohio St.3d 380, 387.
 {¶ 36} The record shows that there were some inconsistencies in Sims' testimony and what he initially told the police versus what he told them later. Officer Cunningham testified that Sims first told him that he did not see a gun on Martin until Martin began patting him down, but Sims testified at trial that Martin had a gun when he began approaching him, before he patted him down. When Officer Cunningham found Sims at "Hayden and Mann," Sims did not tell him that he had also fired a gun at Martin. It was not until Martin showed up at the same hospital with gunshot wounds that Martin told Officer Cunningham upon questioning that he had also fired a gun.
 {¶ 37} In addition, Sims could not tell the police where he got his gun, or what happened to it. Sims initially told Officer Cunningham that he gave his gun to a man named James, but at trial, Sims denied that he told him that and denied knowing anyone named James, and said only that he gave it someone "from the neighborhood."
 {¶ 38} After reviewing the record in its entirety, however, we conclude that any inconsistencies in Sims' "versions" of the events are minor and understandable in light of the fact that he had just been robbed at gunpoint and shot three times. Martin further argues that his convictions were against *Page 11 
the manifest weight of the evidence because Sims was so inconsistent, he was not credible.
 {¶ 39} The state presented evidence that Martin initially gave Officer Cunningham a false name. In fact, Officer Cunningham only found out who Martin was after Martin's mother told him. And although Sims had already named Martin as the person who shot him before Martin showed up at thehospital, and Sims had already told Officer Cunningham that he had also shot Martin before Officer Cunningham spoke to Martin, Martin still would not admit that he was anywhere near "Hayden and Alder." Instead, Martin told officers that he had been shot in Cleveland, but there were no reports of shots being fired in that area, nor was there any evidence that shots had been fired in that area.
 {¶ 40} When assessing witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." State v. Awan (1986),22 Ohio St.3d 120, 123. "Indeed, the factfinder is free to believe all, part, or none of the testimony of each witness appearing before it." Warren v.Simpson (Mar. 17, 2000), 11th Dist. No. 98-T-0183, at 8, citing Hill v.Briggs (1996), 111 Ohio App.3d 405, 412.
 {¶ 41} The jury here was free to believe Sims' versions of the events, despite the minor inconsistencies in his testimony. *Page 12 
 {¶ 42} Martin finally argues that his convictions were against the manifest weight of the evidence because there were no other eyewitnesses or physical evidence to corroborate Sims' version of the events. Although physical evidence and eyewitness testimony is helpful to prove a case, it is not necessary. Sims' testimony as to what happened, as well as the three police officers' testimony, was adequate direct and circumstantial evidence for a rational jury to find Martin guilty beyond a reasonable doubt.
 {¶ 43} "`Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof. When the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction. * * *'"Thompkins, supra, at 385, quoting State v. Jenks (1991),61 Ohio St. 3d 259.
 {¶ 44} Thus, after thoroughly reviewing the record, this is not the case where Martin's convictions created such a manifest miscarriage of justice that they should be reversed and a new trial ordered. Martin's first assignment of error is overruled.
 {¶ 45} In his second assignment of error, Martin argues that the trial court erred when it denied him the opportunity to cross-examine Sims about a purported prior conviction of attempted trafficking in a counterfeit controlled *Page 13 
substance. He argues he should have been permitted to cross-examine Sims regarding this alleged conviction under Evid. R. 609(A)(3).
 {¶ 46} Evid. R. 609(A)(3) provides that for the purpose of attacking the credibility of a witness, "[n]otwithstanding Evid. R. 403(A), but subject to Evid. R. 403(B), evidence that any witness * * * has been convicted of a crime is admissible if the crime involved dishonesty or false statement[.]"
 {¶ 47} A trial court has broad discretion under Evid. R. 609 to determine the extent to which "evidence that any witness" has been convicted of a crime is admissible. Therefore, a reviewing court will not disturb a trial court's rullng unless we find that ruling to be an abuse of discretion, i.e. unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore (1983),5 Ohio St.3d 217.
 {¶ 48} The record reveals that after the trial court sustained the state's objection to Martin cross-examining Sims about a conviction involving an attempted trafficking in counterfeit substances, Martin did not proffer the purported conviction into the record.
 {¶ 49} Although Evid. R. 103(A)(2) provides that "offer of proof" is not necessary if "the substance of the evidence * * * was apparent from the context within which questions were asked," the evidence was not apparent here. *Page 14 
 {¶ 50} It is incumbent upon the party seeking to introduce evidence, be it impeachment or otherwise, to proffer the evidence in order to preserve the record for appeal. Evid. R. 103(A)(2); State v. Grubb
(1986), 28 Ohio St.3d 199, 203. See Jones v. Capco, 8th Dist. Nos. 81748, 81892, 2003-Ohio-5807. Absent a proffer, a reviewing court has no way of determining if the excluded evidence prejudiced the appellant.In Re: Whaley (1993), 86 Ohio App.3d 304. Accordingly, if no proffer is made, the party seeking to introduce the evidence in question waives the error on appeal. Frazier v. Ullom Realty, Inc. (Feb. 13, 1998), 4th Dist. No. 97CA19.
 {¶ 51} Since Martin did not proffer Sims' purported conviction at trial, he has waived any argument regarding it on appeal.
 {¶ 52} Even if this court were to presume that Sims had a prior conviction of attempting to sell counterfeit drugs, and that it would fall under Evid. R. 609(A)(3), as a prior conviction involving dishonesty or a false statement (which we are not determining here), we would still uphold the trial court's decision. It was not unreasonable, arbitrary or unconscionable for the trial court to determine that the probative value of the testimony was substantially outweighed by its prejudicial effect.
 {¶ 53} Martin's second assignment of error is overruled.
 {¶ 54} Accordingly, the judgment of the Cuyahoga County Court of Common Pleas is affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANTHONY O. CALABRESE, JR., J., CONCURS; COLLEEN CONWAY COONEY, P.J., CONCURS IN JUDGMENT ONLY *Page 1