[Cite as *State v Hale*, 2019-Ohio-3276.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

    Plaintiff-Appellee,            :

                                                 No. 107646

    v.                             :

ISIAH B. HALE,                           :

    Defendant-Appellant.           :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED; REMANDED
**RELEASED AND JOURNALIZED:** August 15, 2019

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-16-607517-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brent C. Kirvel, Assistant Prosecuting Attorney, *for appellee.*

Thomas A. Rein, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Defendant-appellant Isiah Hale appeals his convictions after a jury found him guilty of murder, involuntary manslaughter, aggravated robbery, having a weapon while under disability and perjury. He contends that his convictions were not supported by sufficient evidence and were against the manifest weight of the

evidence. He further contends that (1) his reindictment in the instant case, following the dismissal, without prejudice, of similar charges in Cuyahoga C.P. No. CR-09-529253 ("529253"), violated double jeopardy, (2) the trial court erred and violated attorney-client privilege by allowing his former counsel to testify against him at trial, (3) he was denied effective assistance of counsel based on defense counsel's prior representation of a codefendant and (4) the trial court imposed consecutive sentences without making the findings required by R.C. 2929.14(C). For the reasons that follow, we affirm Hale's convictions and sentences but remand the matter for the trial court to issue a nunc pro tunc order which reflects the consecutive sentence findings it made at the sentencing hearing.

**Procedural History and Factual Background**

{¶ 2} In 2009, Hale was charged in 529253 with murder, aggravated robbery, kidnapping and having a weapon while under disability in connection with the September 11, 2009 shooting death of Montrell Stonewall. Hale pled not guilty to the charges. Hale's codefendant, Jermael Burton, was charged with conspiracy to murder, kidnap and rob Stonewall and having a weapon while under disability.

### Hale's Police Interview

{¶ 3} On April 21, 2010, after Hale and the state reached a plea agreement, but before Hale entered his change of plea, Hale submitted to a video-recorded interview, with counsel present, with the East Cleveland police. East Cleveland police detectives Scott Gardner and Reggie Holcomb conducted the interview. At the outset, one of the detectives informed Hale that the purpose of the interview was

to "find out exactly what [Burton's] involvement is" in the events surrounding Stonewall's death. The detective further stated that "nothing you're saying here is going to influence or effect what the attorneys have already figured out." Hale told the detectives that, while he was on his way home, he received a call from Burton. Hale stated that Burton told him that he was involved in a drug transaction and that it was "not going right" and was "taking a turn for the worse." According to Hale, Burton asked Hale if he could come out and "mediate the situation with him so that it did not get all the way out of hand." Hale stated that Burton did not ask him to bring a gun and that he never told Burton he would bring a gun but that Burton knew Hale would "come and back him up."

{¶ 4} When Hale arrived at the scene, Burton explained to Hale what was "going on with the situation." According to Hale, Burton informed him that Stromboli Douglas had arranged a drug deal between Burton and two men from out of town whom Hale did not know, but who were later identified as Stonewall and his half-brother, Luis Santiago. Hale stated that he had seen Douglas before but did not know him. Stonewall and Santiago had allegedly taken some drugs out of the bag Burton had given them and were "trying to negotiate a better price." Hale stated that he agreed to "go and see and talk to the guys, basically just being a mediator" in an attempt to resolve the issue. Hale stated that he never saw the drugs nor the money that was to be used to purchase the drugs.

{¶ 5} Hale stated that he went to talk to Stonewall and Santiago and got into the backseat of their car. According to Hale, once he was in the car, Stonewall

looked back at him, "pull[ed] off" and said, "I got you, m***** f*****." Hale stated that he was "puzzled" and told Stonewall repeatedly to stop the car. Hale stated that he thought they were trying to rob him. Hale said that he pulled out a gun and, once again, told Stonewall to stop the car. Stonewall stopped the car "a little bit, then goes, stops and goes" until he finally stopped the car. Hale told the police that as he was getting out of the car, Stonewall turned around and pointed a gun at him. Hale stated that "out of fear," Hale fired his gun in an attempt to "get away from the situation," then ran home. Hale claimed that he did not know that he had shot Stonewall at the time.

**Hale's Guilty Plea**

{¶ 6}  On the day following his interview with police, Hale pled guilty to an amended count of involuntary manslaughter with a three-year firearm specification. The remaining charges were dismissed. At the time of Hale's change of plea, Burton had not yet been apprehended. One of the conditions of Hale's plea agreement was that if Burton was apprehended and the case against Burton proceeded to trial, Hale would testify "consistent with [the] apparent truthful statement" he had given during his interview the previous day. The trial court referred Hale to the probation department for a presentence investigation report ("PSI").

{¶ 7}  On May 20, 2010, Hale was sentenced to eight years in prison, i.e., three years on the firearm specification to be served prior to and consecutive to five years on the involuntary manslaughter charge. Hale also received an additional two years in prison in a federal case due to his violation of supervised release.

**Burton's Trial and Hale's Motion to Withdraw His Guilty Plea**

{¶ 8} Burton was ultimately apprehended and the case against him proceeded to trial in January 2011. During the middle of Burton's trial, the state disclosed that a gunshot residue test performed on Stonewall's hands revealed gunshot primer residue on Stonewall's right hand. Hale's attorneys had requested the results of any gun residue testing performed on Stonewall during pretrial discovery. Although the Cuyahoga County Coroner's Office issued a report with the test results on March 5, 2010, the test results were not disclosed to Hale's attorneys until January 4, 2011. *See State v. Hale*, 8th Dist. Cuyahoga No. 100447, 2014-Ohio-3322, ¶ 4.

{¶ 9} On January 5, 2011, Hale filed a motion to withdraw his guilty plea in 529253 based on the state's failure to disclose the results of the gunshot residue test performed on Stonewall. Hale argued that the test results were material to his claim, which he had asserted throughout the case, that he had shot Stonewall in self-defense. The state opposed the motion.

{¶ 10} When the state called Hale to testify at Burton's trial, as contemplated by the plea agreement, Hale asserted his Fifth Amendment right against self-incrimination.

{¶ 11} Burton was acquitted of the charges against him relating to Stonewall's death. At the close of the state's case, the trial court granted Burton's

Crim.R. 29 motion for a judgment of acquittal on all of the charges against him in 529253.

{¶ 12} At the time he entered his guilty plea, Hale was represented by Attorneys Edward LaRue and Anthony Lonardo. After filing his motion to withdraw his guilty plea, Hale hired Attorney Michael Cheselka to represent him. Attorney Cheselka had represented Burton in Burton's trial on the charges relating to Stonewall's death.

**Hale's Testimony at the Hearing on the Motion to Withdraw His Guilty Plea**

{¶ 13} On May 6, 2011, the trial court commenced a hearing on Hale's motion to withdraw his guilty plea. The hearing continued on May 11, 2011. At the hearing, Hale testified regarding his discussions with Attorneys LaRue and Lonardo about what happened the night Stonewall was shot.[1] Hale testified that when he first met with Attorneys LaRue and Lonardo, he told them "the truth" about what had happened that night, as follows: On the evening of September 11, 2009, Hale received a call from Burton, who asked him "to come up there" to "Middle Street,"[2] around the corner from Hale's house. When he arrived, Hale was flagged down by Douglas, who asked him "about some marijuana" and told him that "they wanted to talk over there in the car." Hale parked his car, then walked over to the other car in

---

[1] Hale testified that his brother had hired Attorneys LaRue and Lonardo to represent Hale.

[2] Hale testified that "Middle Street" was a nickname for Nelamere Road off Noble Road in East Cleveland.

which two individuals (who he later learned were Stonewall and Santiago) were waiting. After he got into the car, it "pulled off" and, despite his protests, Stonewell (the driver) refused to stop the car. As he reached for the door handle to get out, Santiago (the front seat passenger) pulled a gun on Hale. Hale "wrestled" the gun away from Santiago and, once again, told Stonewall to stop the car. Stonewall stopped the car. As Hale exited the car, Stonewall turned around and fired one or more shots at Hale. Hale stated that he fired back in "self-defense," then ran off through the woods dropping the gun as he ran. Hale stated that Burton never told him to bring a gun with him, that Hale had not brought a gun with him when he went to meet Burton and that Hale never actually spoke with Burton after he arrived at the scene.

{¶ 14} Hale testified that Attorneys LaRue and Lonardo initially told him that they had "a good case" and that they were "going to win this" at trial but that when he could not come up with the additional money they said they needed to prepare for trial, they told him that he would not likely prevail at trial and that it would be in his "best interest to take the [plea] deal." Hale testified that he never wavered in the version of events he told his attorneys but that his attorneys told him that his "story" was "not going to fly" and that he could either "go in there with that story and get life if you want to or[,] go with the flow, take [the] deal, and come home in six years." Hale testified that his attorneys told him that, to get the plea deal, he needed to "just go with" what everyone else was saying, i.e., to say that he had come to the scene to "mediate" a drug deal and had used his own gun to shoot Stonewall

and to "say nothing" about "self-defense." Hale claimed that the version of events he had previously told to (1) the East Cleveland police on April 21, 2010, (2) the probation officer who conducted the presentence investigation and (3) "in court" was "all a lie" that his attorneys "made * * * up" and that he told the "story" his attorneys said he needed to tell in order to get the plea deal. Hale claimed that his attorneys told him that "there was no other way."

{¶ 15} On August 26, 2013, the trial court granted Hale's motion to withdraw his guilty plea. The trial court found that the delayed disclosure of the gunshot residue test results was a *Brady* violation, was "material to the issue of guilt" because it substantiated Hale's claim that he had acted in self-defense and was "tantamount to a manifest injustice mandating the granting [of Hale's motion]." The state appealed. This court affirmed the trial court's decision.[3] *State v. Hale*, 8th Dist. Cuyahoga No. 100447, 2014-Ohio-3322.

---

[3] There was no finding that the state intentionally or willfully withheld the gunshot residue test results. As this court explained:

> [I]n 2010, a trace evidence report was generated by the coroner's office following the examination of the victim. Contained in that report was a finding indicating that gunshot primer residue was detected on the victim's right hand. Despite discovery being requested by Hale, the defense did not receive this report. In fact, the record reveals that this report was not released to either the state or the defense until January 2011, the day prior to the start of the trial against Hale's codefendant. It is clear that the withholding of the report was inadvertent by the coroner's office, and not willful by the state.

*Hale*, 2014-Ohio-3322, at ¶ 9.

**Dismissal of Original Case and Reindictment**

{¶ 16} On remand, the case was scheduled for trial. On June 6, 2016, the date the trial was scheduled to begin, the trial court dismissed the charges against Hale in 529253 without prejudice, at the state's request.

{¶ 17} On July 28, 2016, a Cuyahoga County Grand Jury reindicted Hale on counts of murder, aggravated robbery, kidnapping and having a weapon while under disability in connection with the September 11, 2009 shooting death of Stonewall. The murder, aggravated robbery and kidnapping counts included one-year and three-year firearm specifications. Hale was also indicted on one count of perjury in violation of R.C. 2921.11(A) based on his alleged "false testimony" at the hearing on his motion to withdraw his guilty plea.[4] A jury trial commenced on July 31, 2018.

**Hale's Trial**

**The State's Witnesses**

{¶ 18} Ten witnesses testified on behalf of the state at trial, including Burton, Douglas, Santiago, Detective Holcomb, Attorney Lonardo, Kahdawna Garrison (a friend Stonewall had planned to meet in Cleveland), Erica Armstrong (deputy medical examiner at the Cuyahoga County Medical Examiner's Office), Curtiss Jones (supervisor of the trace evidence department of the Cuyahoga County Medical Examiner's Office), Mark Kollar (a special agent supervisor for the Ohio Attorney

---

[4] Specifically, the indictment alleged that Hale had given "[f]alse testimony under oath on May 6, 2011 and May 11, 2011 * * * to support withdraw[al] of previously entered plea" that "was used to undermine previous video-recorded statements by [Hale] to [the] East Cleveland police department with counsel present."

General's Office, Bureau of Criminal Investigation) and Amanda Bailey (an eyewitness). A summary of the relevant testimony follows.

{¶ 19} Santiago testified that he and Stonewall, both of whom lived in Erie, Pennsylvania, had traveled to Cleveland to "chill" with a female friend of Stonewall's, i.e., Garrison, and one of her "cousins." Santiago testified that when they first got to Cleveland, they went to a gas station and met Douglas. He stated that Douglas got into the car with them and the three men got something to eat, then proceeded on their way to meet Garrison. While they were on their way to Garrison's house, Stonewall made a stop. Santiago testified that Stonewall and Douglas stepped out of the car and were "talking or something," then got back into the car. Santiago stated that he had not been aware of any plan to get drugs while they were in Cleveland but that if Stonewall had had such plans, he would not have told Santiago because Santiago did not "live none of that at all."

{¶ 20} They drove around for a bit then stopped and parked at a street on a hill. Santiago testified that a car pulled up, that Stonewall and Douglas had a discussion, that Stonewall gave Douglas "some money or something" and that Douglas then ran out of the car.

{¶ 21} Santiago testified that a male he did not recognize then came out of an alleyway, opened the unlocked car door and got into the car with them. He testified that the man (later identified as Hale) said, "give it up," and pulled out a gun. Stonewall put the car in drive and sped off. Santiago testified that Hale was sitting behind the driver's seat with the gun pointed toward the front of the vehicle

and that Hale and Stonewall were "tussling" and "going back and forth" as Stonewall was trying to grab Hale. Santiago took the wheel and Stonewall began quickly accelerating and stopping the car "to get tension off him a bit." Santiago testified that when Stonewall eventually stopped the car, Hale got out of the car and shot Stonewall. Immediately after firing the shots, Hale ran off. Santiago testified that neither he nor Stonewall had a gun with them that evening.

{¶ 22} Santiago testified that after the shots were fired, Stonewall did a U-turn back toward the gas station where Douglas was waiting. They located Douglas, and Douglas drove them to the hospital. When they arrived at the hospital, Santiago and Douglas were immediately detained. Santiago later learned that Stonewall had died in surgery. Santiago identified Hale as the perpetrator in a photo array on September 21, 2009, and again in court during his trial testimony.

{¶ 23} Douglas testified that Stonewall was a "friend" he had known for approximately a year prior to the shooting and that he had not previously met Santiago. Douglas testified that Stonewall had come into town to visit him, that Stonewall had wanted to buy an ounce of powder cocaine and that Douglas had agreed to be the "middle man" for the drug transaction.

{¶ 24} Douglas stated that when Stonewall and Santiago arrived in Cleveland, they picked up Douglas, got food and hung out together "for some hours," "riding around" and "stop[ping] at a few places." Douglas testified that he called Burton, who was to supply the cocaine, and they made arrangements to meet on Noble Road in Cleveland Heights, Ohio, in between a gas station and the Columbo

Room restaurant. Douglas testified that, when they arrived at the meeting place, Douglas got out of the car and spoke with Burton. Douglas testified that Stonewall had already given him $1,000 to purchase the cocaine. Douglas stated that Burton gave him a bag of cocaine and that Douglas brought it over to Stonewall, who was still sitting in his car and told him the price. Douglas testified that after looking at the cocaine, Stonewall said, "this is not right," and asked Douglas to see if he could "get it for a cheaper price." Douglas took the cocaine back to Burton and told him what Stonewall had said. Douglas still had Stonewall's $1,000.

{¶ 25} Douglas stated that when he gave the bag back to Burton, Burton "reacted like * * * we did something to it." Douglas denied that they did anything to the drugs. Douglas testified that Burton then made a telephone call. Douglas stated that he did not know whom Burton called but that Burton told the person on the other line "to get something from the house and bring it to where we was at." Ten or 15 minutes later, Hale appeared in an old Ford truck.

{¶ 26} Douglas identified Hale in the courtroom. He described Hale as an "associate" he knew from having attended Shaw High School together. Douglas testified that after Hale got out of the truck, he walked towards Douglas and Burton. Hale and Burton greeted one another, then Burton told Hale to "go to that car." Douglas testified that Hale walked over to Stonewall's car, opened the door and spoke briefly with Stonewall and Santiago. Douglas could not hear what was said. Douglas testified that Hale then "helped himself" into the back seat of Stonewall's car and it "drove off real fast."

{¶ 27} Douglas stated that Burton then got into his car and drove fast toward Douglas. Douglas jumped out of the way, then started running through the parking lot of the gas station to see where the cars were going. As he approached the corner of the gas station parking lot, Douglas heard gunshots, then stopped. Douglas testified that he heard a police officer say, "freeze," then saw an officer and a person he assumed was Hale running across the street. Stonewall's car then pulled up across the street. Douglas got into the car and Stonewall told Douglas he had been shot. Douglas began giving Stonewall directions to the hospital then had him pull over so that they could switch positions. Douglas and Santiago moved Stonewall to the back seat of the car and Douglas drove to the hospital. Stonewall died during surgery.

{¶ 28} Douglas testified that neither Stonewall nor Santiago had a gun that evening. Douglas stated that he had set up drug deals for Stonewall "a lot of times" and that Stonewall "don't ride like that."

{¶ 29} Burton offered a slightly different version of events. He stated that he had known Hale for "roughly about 17 years" and that he knew Douglas from school. Burton testified that he had "a situation" with Douglas, i.e., that Douglas called him and said he wanted to meet Burton, so Burton agreed to meet Douglas at Nelamere Road off Noble Road in East Cleveland. Burton testified that Douglas was with two men he did not know. Burton testified that Douglas came over to talk to him, went back to the vehicle to talk to the two men he was with, then came back to talk to Burton again. After talking with Douglas, Burton told Douglas "that's not going to

work." Burton testified that he did not call Hale to come to the scene, that Hale was already there, and that he did not talk to Hale at the scene. Burton stated that he went back into his car for "like two seconds" and that when he came back, Douglas and Hale were talking. Burton testified that, by this time, his "business [with Douglas] was concluded" and that he "chose to get in [his] car and end the encounter that we had." Burton stated that he was getting ready to leave when "a lot of commotion started" and he saw a car "just take off." Burton testified that he heard a girl scream and got into his car and drove toward the gas station. Burton testified that he saw the vehicle that had driven off swing back into the gas station and that Douglas got into the car. Burton denied hearing any gun shots. Burton stated that he did not learn until a week later that someone had died.

{¶ 30} Garrison testified that she had met Stonewall at the Presque Isle Casino in Erie, Pennsylvania, about four months earlier. She stated that Stonewall was supposed to pick her up that evening and take her back with him to Erie for the weekend. She testified that she had been communicating with Stonewall regularly as he was driving from Erie to Cleveland and that he told her he was going to stop and see a friend before getting her. He later called her and told her he was on his way, and Garrison went outside to smoke a cigarette and wait for him. While she was outside waiting for Stonewall, she heard a gunshot. When Stonewall did not pick her up as planned, Garrison called Santiago, who informed her that Stonewall had been shot. Garrison testified that she had never seen Stonewall carry a firearm and that she did not know Hale, Burton or Douglas.

{¶ 31} Bailey testified that on the evening of September 11, 2009, she was driving on Noble Road, on her way to meet friends at a bar on Euclid Avenue in Cleveland. As she passed the gas station, cars were stopped in the middle of the road. As she began backing up her vehicle to get around the stopped cars, a car moved forward and swerved into the opposite lane. Bailey testified that she saw someone get out of the car and fire approximately three shots in the direction of the car. The shooter then ran and the car sped off. She could not identify the shooter.

{¶ 32} Armstrong performed an autopsy on Stonewall. She testified that Stonewall died from a gunshot wound to the left chest, i.e., that a bullet had entered Stonewall's chest at the left nipple and travelled horizontally across his body, passing through the lungs and heart, into the right side of his back.

{¶ 33} Jones testified regarding the results of the gunshot primer residue testing conducted on Stonewall's hands. He indicated that Stonewall's right hand tested positive for gunshot primer residue, but his left hand did not. Jones explained that when a gun is shot, gunshot primer residue escapes through gaps on the sides of the weapon. He stated that if gunshot primer residue is found on a person's hand, one of three things has occurred: (1) the individual shot a gun, (2) the individual was in close proximity to the discharge of a gun or (3) the individual came into contact with a surface that had gunshot primer residue on it and there was a transfer of gunshot primer residue from that surface to the person's hand. He could not state which occurred here.

{¶ 34} Kollar processed Stonewall's vehicle, looking for trace evidence. Kollar testified that, based on what he observed, two bullets appeared to have been shot in a downward trajectory into the vehicle through the open, driver-side rear door. He explained that there were two bullet defects in the vehicle — one that came through the back of the driver's seat and one that was found in the door jamb. Using trajectory rods, he determined that the shots were likely fired from the rear toward the front of the vehicle and downward. He testified that, although the bullet defect observed in the driver's seat could have potentially been fired from inside the vehicle, given the absence of any fouling or stippling where the bullet entered the driver's seat, he believed that it was more likely that that bullet had been shot from more than six feet away.

{¶ 35} Sergeant Holcomb testified regarding additional aspects of the East Cleveland Police Department's investigation of the incident, including the crime scene photographs, efforts to apprehend Burton and the April 2010 interview of Hale. Sergeant Holcomb testified that all of the blood samples collected from the car were Stonewall's blood, that a partial palm print on the back of Stonewall's vehicle belonged to Douglas and that a hair found was from a Caucasian female and did not relate to the case. He testified that the gun used in the shooting was never recovered.

{¶ 36} Attorney Lonardo testified regarding Hale's claim that he and Attorney LaRue told Hale to lie about what had occurred leading up to the shooting of Stonewall. Attorney Lonardo denied that he told Hale to lie "in any way, shape,

or form" and specifically denied telling Hale to say that he brought his gun to the scene rather than telling the alleged "real story," i.e., that Hale "wrestled" a gun away from Santiago. Attorney Lonardo stated that it had "always been our position that it was self-defense" and that they had been trying to develop evidence of self-defense (which is why they had made a specific request for any information regarding gun residue testing of Stonewall's hands), but that it was difficult to put together a self-defense case because they had uncovered no evidence, at that time, beyond what Hale had told them, that Stonewall had had a gun.

{¶ 37} The state played the recording of the April 2010 interview for the jury. Excerpts of Hale's testimony at the May 6 and May 11, 2011 hearing on Hale's motion to withdraw his guilty plea were also read to the jury. The parties stipulated to a certified journal entry reflecting Hale's prior conviction for drug trafficking in violation of R.C. 2925.03 in Cuyahoga C.P. No. CR-02-421537.

{¶ 38} After the state rested, Hale moved for an acquittal under Crim.R. 29. The trial court denied the motion.

**Hale's Trial Testimony**

{¶ 39} Hale was the sole witness to testify on behalf of the defense. Hale admitted that he fired two shots into the back of Stonewall's car on the evening of September 11, 2009 but claimed that he did it in self-defense, i.e., that when he got out of Stonewall's car that evening, Stonewall fired at him first and Hale fired back.

{¶ 40} Hale denied that anyone had called him to come to the scene that evening. He stated that he came to the scene because he "live[d] up there." Hale

testified that when he arrived at the scene, Douglas "flagged me down" and "asked me about some marijuana." Hale stated that he knew Douglas through Burton. Hale parked his car and came back down the street. Hale testified that Douglas told him that "they wanted it in the car" and Hale walked over to Stonewall's car. Hale testified that he did not talk to Burton before he went over to the car and did not see Burton when he pulled up. Hale testified that he got into Stonewall's car and "they took off." Hale said that he repeatedly told Stonewall to "stop the car," but that Stonewall refused.

{¶ 41} Hale testified that Santiago "pulled a gun on me" and that Hale "went for it." Hale stated that he and Santiago "wrestled over" the gun and that once Hale obtained control of Santiago's gun, Stonewall stopped the car. Hale testified that as he attempted to get out of the car and get away, Stonewall, still sitting in the driver's seat, turned around and fired at him. Hale then fired back with Santiago's gun. Hale testified that after he fired back, he saw the car "do a U-turn" and come back up the hill towards him. Hale stated that he thought they were coming back to "finish me off." He ran home, dropping the gun as he ran "up through the woods" behind the back of a nearby building. Hale testified that he did not realize he had shot Stonewall because "when the shot was fired at me and the bullet whizzed past me and I fired back, I wasn't taking aim at anything." Hale stated that he "just pointed and ran and shot."

{¶ 42} Hale testified that he was arrested while working at his brother's "car lot" a week later. Hale testified that when he spoke with Attorneys LaRue and

Lonardo about what had happened, Hale told them "the truth," i.e., what he had testified to at trial. According to Hale, he told Attorneys LaRue and Lonardo more than ten times that he had been shot at before he fired the shot that killed Stonewall.

{¶ 43} Hale stated that initially, his attorneys told him that that they could win the case and "everything's fine." However, as they got closer to trial, Attorneys LaRue and Lonardo told him that there was no way to prove Hale's "theory of what had happened" and that he "wouldn't win at trial" because there was no evidence that Stonewall had fired a weapon. Hale testified that his attorneys told him that he could "take a deal" or "go to trial and lose and get life." Although Hale acknowledged that his attorneys never explicitly told him to "lie," he said that they told him what he would have to do in order to get the plea deal, which included "changing his story" regarding what had happened. Hale testified that his attorneys told him what changes needed to be made to his story in order to get the plea deal and that he then "changed his story" as directed by his attorneys. Hale stated that, although what he told police was not the truth, he did not consider himself as having "lied" in the April 2010 interview because he simply said "what was expected for me to say" in order to get the plea deal.

{¶ 44} Hale testified that the interview he gave police in April 2010 was not enough to get the plea deal. He stated that he also had to "[g]ive a report [for] the PSI[5] and * * * go in at sentencing and pretty much continue to admit guilt."

---

[5] The PSI states, in relevant part:

{¶ 45} Hale admitted that he had been previously convicted of drug trafficking, a felony, and that, as a result, he was prohibited from having a firearm. Because Hale was on supervised release for a federal offense at the time of Stonewall's shooting, when Hale entered his guilty plea in 529253, Hale also faced additional prison time in the federal case, N.D.Ohio No. 1:04cr467, for violating the terms of his supervised release. During Hale's supervised released violation hearing, Hale admitted to the federal court judge that he had been involved in "a drug deal gone bad," that he had been "involved in more trafficking and having a gun" and that he was "taking responsibility" for his "involvement in this matter."

---

The defendant readily admits his guilt in the present offense and stated that he never intended to harm anyone. The defendant stated on the day of the offense, he received a call from co-defendant Jermael Burton. Jermael Burton asked the defendant to meet him, where he was attempting to sell cocaine to several males. The defendant stated Jermael Burton indicated he and the males were unable to agree on a price for the cocaine, and asked the defendant if he could mediate the transaction. The defendant stated he arrived on the scene and entered the back seat of a vehicle. Also inside the vehicle was the victim and two other males. The defendant stated at that point, the victim began to argue and "swear" at the defendant over the drug transaction. The defendant stated at that time, he observed the victim "reach for something." The defendant stated he told the victim to stop the vehicle[;] however, the victim refused to do so. The defendant stated at that point, he opened the car door, and pulled out his own weapon, which he described as "9 mm." The defendant stated he repeatedly "stopped the car," and at that time observed the victim point a weapon at him. The defendant stated, "he panicked," and fired two shots at the victim. The defendant stated he then exited the vehicle and fled the scene. The defendant stated he did not think he shot the victim, and added he had the weapon for his own protection, since he was employed "repo[']ing cars." The defendant stated he never intended to harm anyone.

Hale testified that this "story," albeit untrue, was what he had told the probation officer had occurred. He stated that he got the "facts" for this "story," such as the reference to a "cocaine" deal and a "nine-millimeter" weapon, from the "reports" he had read regarding the evidence the state had uncovered and what other witnesses had said had occurred.

{¶ 46} Hale testified that after he learned that the state had "the evidence and proof that would have been needed * * * to prove my theory of what I was saying all along had happened" and had failed to produce it, he immediately asked his attorneys to file a motion to withdraw his guilty plea. Hale stated that he wanted to prove his innocence because he was the one who had actually been the victim, i.e., that he had been "kidnapped," "almost robbed" and shot at that evening by Stonewall.

{¶ 47} After the defense rested, Hale renewed his Crim.R. 29 motion for acquittal. Once again, the trial court denied the motion.

{¶ 48} The jury found Hale not guilty of murder in violation of R.C. 2903.02(A) but guilty of the lesser-included offense of involuntary manslaughter in violation of R.C. 2903.04(A). The jury also found Hale guilty of murder in violation of R.C. 2903.02(B), aggravated robbery in violation of R.C. 2911.01(A)(1), having a weapon while under disability in violation of R.C. 2923.13(A)(3) and perjury in violation of R.C. 2921.11(A), including the associated firearm specifications. The jury found Hale not guilty of kidnapping in violation of R.C. 2905.01(A)(2).

{¶ 49} Hale was sentenced on August 9, 2018. The trial court merged the murder, involuntary manslaughter and aggravated robbery counts for sentencing and the state elected to have Hale sentenced on the murder count. The court sentenced Hale to an aggregate sentence of 21 years to life — i.e., 3 years on the firearm specification to be served prior to and consecutive to 15 years to life on the underlying murder charge, 3 years on the having weapons while under disability

count to be served consecutively to the sentence on the firearm specification but concurrently with the sentence on the underlying murder charge and 3 years on the perjury count to be served consecutively to the sentence on the firearm specification and consecutively to the sentence on the underlying murder charge.

{¶ 50} In imposing consecutive sentences the trial court stated:

I find that consecutive sentences are necessary in this particular case because, of course, in this particular instance consecutive sentences is necessary to protect the public from future crime and, of course, to punish this offender.

The consecutive sentences are not disproportionate to the seriousness of this offender's conduct and to the danger that this offender poses to the public.

I also find additionally that the offender's history and criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by this offender.

Additionally, I'm going to note for the record the defendant has, of course, a criminal history. He was on Federal Parole at the time that he committed these offenses.

{¶ 51} In its August 15, 2018 sentencing journal entry, the trial court made the following findings with respect to the imposition of consecutive sentences:

The court imposes prison terms consecutively finding that consecutive service is necessary to protect the public from future crime or to punish defendant; that the consecutive sentences are not disproportionate to the seriousness of defendant's conduct and to the danger defendant poses to the public; and that, at least two of the multiple offenses were committed in this case as part of one or more courses of conduct, and that harm caused by said multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses if conduct adequately reflects the seriousness of defendant's conduct.

**{¶ 52}** Hale appealed, raising the following six assignments of error for review:

FIRST ASSIGNMENT OF ERROR
The trial court erred by failing to grant a judgment of acquittal, pursuant to Crim.R. 29(A), on the charges, and thereafter entering a judgment of conviction of that offense as those charges were not supported by sufficient evidence, in violation of defendant's right to due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution.

SECOND ASSIGNMENT OF ERROR
Appellant's convictions are against the manifest weight of the evidence.

THIRD ASSIGNMENT OF ERROR
Appellant was denied his rights against Double Jeopardy when he was tried a second time for the same charges after the prosecutor failed to disclose exculpatory evidence.

FOURTH ASSIGNMENT OF ERROR
The trial court erred by allowing Appellant's former attorney to testify against him in violation of attorney-client privilege.

FIFTH ASSIGNMENT OF ERROR
Appellant was denied effective assistance of counsel as guaranteed by Section 10, Article I of the Ohio Constitution and the Sixth and Fourteenth Amendments.

SIXTH ASSIGNMENT OF ERROR
The trial court erred by ordering Appellant to serve a consecutive sentence without making the appropriate findings required by R.C. 2929.14 and HB 86.

**{¶ 53}** For ease of discussion, we address Hale's assignments of error out of order and together where appropriate.

**Law and Analysis**

**Double Jeopardy**

{¶ 54} We address Hale's third assignment of error first. In his third assignment of error, Hale contends that his convictions should be reversed on double jeopardy grounds because "he was tried a second time for the same charges" and was reindicted on an additional charge of perjury after he "exercised his right to withdraw his guilty plea."

{¶ 55} Hale did not raise a double jeopardy issue below. Because no objection was raised in the trial court, we review this assignment of error for plain error. *See, e.g., In re J.T.*, 2017-Ohio-7723, 85 N.E.3d 763, ¶ 15 (8th Dist.) ("When a defendant fails to object or raise the issue of double jeopardy at trial * * * an appellate court reviews the issue for plain error."). Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To establish plain error, the defendant must show that an error occurred, that the error was obvious, and that the error affected his or her substantial rights. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22; *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). In order for an error to have affected a defendant's substantial rights, the error must have affected the outcome of the trial. *Id.* "'Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.'" *State v. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, 98 N.E.3d 251, ¶ 23, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804

(1978), paragraph three of the syllabus. A violation of double jeopardy constitutes plain error. *In re J.T.* at ¶ 15; *State v. Ollison*, 2016-Ohio-8269, 78 N.E.3d 254, ¶ 27 (10th Dist.).

{¶ 56} The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." This protection applies to Ohio citizens through the Fourteenth Amendment to the United States Constitution. *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, ¶ 10, citing *Benton v. Maryland*, 395 U.S. 784, 786, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Similarly, the Ohio Constitution provides: "No person shall be twice put in jeopardy for the same offense." Ohio Constitution, Article I, Section 10. The protections afforded by the double jeopardy clauses of the Ohio and United States Constitutions are "coextensive." *State v. Mutter*, 150 Ohio St.3d 429, 2017-Ohio-2928, 82 N.E.3d 1141, ¶ 15, citing *State v. Martello*, 97 Ohio St.3d 398, 2002-Ohio-6661, 780 N.E.2d 250, ¶ 7.

{¶ 57} The prohibition against double jeopardy clause "protects against three abuses": (1) "'a second prosecution for the same offense after acquittal,'" (2) "'a second prosecution for the same offense after conviction'" and (3) "'multiple punishments for the same offense.'" *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 10, quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled on other grounds, Alabama v. Smith*,

490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). None of these "abuses" is implicated in this case.

{¶ 58} Despite his assertions to the contrary, Hale was tried only once for the offenses at issue. Once a guilty plea is withdrawn, the case goes back to where it was before the defendant entered the guilty plea and proceeds as if the guilty plea was never entered. In this case, after Hale withdrew his guilty plea in 529253, the case was set for a jury trial.

{¶ 59} Jeopardy attaches in a jury trial when "the jury is impaneled and sworn." *State v. Gustafson*, 76 Ohio St.3d 425, 435, 668 N.E.2d 435 (1996); *see also State v. Martin*, 8th Dist. Cuyahoga No. 87618, 2007-Ohio-1833, ¶ 18, citing *Dowling v. United States*, 493 U.S. 342, 348, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990).

{¶ 60} On June 6, 2016, the date trial was scheduled to begin in 529253 but before jury selection began, the trial court granted the state's request to dismiss the case without prejudice. Crim.R. 48(A) provides: "The state may by leave of court and in open court file an entry of dismissal of an indictment * * * and the prosecution shall * * * terminate." "'[T]ermination of a proceeding before jeopardy has attached, even if harmful to the defendant in some way, does not entitle him to relief under the double jeopardy clause.'" *State v. Larabee*, 69 Ohio St.3d 357, 358, 632 N.E.2d 511 (1994), quoting LaFave & Israel, *Criminal Procedure,* Section 24.1(c) at 900 (1985). In July 2016, Hale was reindicted in this case on the original charges and an additional charge of perjury.

{¶ 61} If charges are dismissed before jeopardy attaches, then reindictment is permitted. *See, e.g., State v. Easter*, 9th Dist. Summit No. 15537, 1992 Ohio App. LEXIS 4616, 8 (Sept. 9, 1992); *see also State v. Jackson*, 9th Dist. Lorain No. 96CA006560, 1997 Ohio App. LEXIS 5144, 5 (Nov. 12, 1997) ("The entry of a nolle prosequi before the accused is placed in jeopardy 'returns the parties to their relative positions prior to the institution of the prosecution.' * * * A nolle prosequi entered before commencement of trial is prior to the attachment of jeopardy."), quoting *State v. Tankersley*, 8th Dist. Cuyahoga Nos. 70068 and 70069, 1996 Ohio App. LEXIS 4791, 6 (Oct. 31, 1996); *State ex rel. Nash v. Fuerst*, 8th Dist. Cuyahoga No. 87966, 2006-Ohio-5261, ¶ 6 ("'[W]hen a nolle prosequi is entered before a jury is sworn, a defendant has not been placed in jeopardy, and another prosecution for the same offense is permissible.'"), quoting *State v. Johnson*, 68 Ohio App.3d 272, 277, 588 N.E.2d 224 (9th Dist.1990); *State v. Frost*, 8th Dist. Cuyahoga No. 45561, 1983 Ohio App. LEXIS 13860, 4 (June 23, 1983) ("The entry of a nolle prosequi restores an accused to the status of a person against whom charges have never been filed.").

{¶ 62} Because jeopardy never attached before the jury was empaneled and sworn in the instant case, the state was permitted to dismiss the charges against Hale in 529253 and he could be reindicted on the charges in this case. Hale's convictions did not violate double jeopardy, and no plain error is found to exist. Hale's third assignment of error is overruled.

**Ineffective Assistance of Counsel**

{¶ 63} In his fifth assignment of error, Hale contends that he was denied effective assistance of counsel in violation of Article I, Section 10, of the Ohio Constitution and the Sixth and Fourteenth Amendments to the United States Constitution because the trial court "allow[ed]" Attorney Cheselka to represent him at trial despite the fact that he had previously represented his codefendant Burton in Burton's trial relating to the shooting of Stonewall.

{¶ 64} The Sixth Amendment right to the effective assistance of counsel secures to a criminal defendant both the right to competent representation and the right to representation that is free from conflicts of interest. *State v. Dillon*, 74 Ohio St.3d 166, 167, 657 N.E.2d 273 (1995) ("Where there is a right to counsel, the Sixth Amendment to the United States Constitution also guarantees that representation will be free from conflicts of interest."). "'The term "conflict of interest" bespeaks a situation in which regard for one duty tends to lead to disregard of another.'" *State v. Manross*, 40 Ohio St.3d 180, 182, 532 N.E.2d 735 (1988), quoting *Goitia v. United States*, 409 F.2d 524, 527 (1st Cir.1969). A possible conflict exists if "'interests * * * may diverge at some point so as to place the attorney under inconsistent duties.'" *Dillon* at 168, quoting *Cuyler v. Sullivan*, 446 U.S. 335, 356, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), fn. 3 (Marshall, J., concurring in part and dissenting in part).

{¶ 65} However, where a defendant raises no objection at trial, the defendant must demonstrate that an actual conflict of interest adversely affected defense counsel's performance to establish a violation of his Sixth Amendment right

to effective assistance of counsel. *Manross*, 40 Ohio St.3d at 182, citing *Cuyler* at 348. "A reviewing court cannot presume that the possibility for conflict resulted in ineffective assistance of counsel. The mere possibility of a conflict of interest is insufficient to impugn a criminal conviction." *Id.* "[A]n actual conflict exists if 'during the course of representation, * * * interests do diverge with respect to a material fact or legal issue or to a course of action.'" (Emphasis deleted.) *State v. Gillard*, 78 Ohio St.3d 548, 553, 679 N.E.2d 276 (1997), quoting *Cuyler* at 356. To establish an actual conflict, a defendant must show: (1) the existence of some plausible alternative defense strategy or tactic that might have been pursued and (2) that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests. *Gillard* at 553.

{¶ 66} In this case, before trial began, the trial court, sua sponte, raised the issue of whether a possible conflict of interest existed given that (1) Attorney Cheselka had previously represented Burton on charges relating Stonewall's death and (2) Burton was a potential witness for the state in Hale's trial, where he could be subject to cross-examination by Attorney Cheselka. The record reflects that the trial court delayed the trial so that Attorney Cheselka could consult with ethics counsel regarding the potential conflict of interest. Although Attorney Cheselka reported that ethics counsel had advised him that there was no actual conflict of interest, the trial court nevertheless proceeded to have a lengthy discussion with Hale on the record regarding the potential conflict of interest, ensuring that Hale understood the potential conflict of interest and the possible "pitfalls" associated

with Attorney Cheselka's representation of Hale given that potential conflict of interest. Following this discussion, Hale indicated that, notwithstanding the potential conflict of interest, Hale still wanted "to continue with [Attorney] Cheselka as [his] counsel."

{¶ 67} In this case, not only did Hale raise no objection to Attorney Cheselka's successive representation of Burton and Hale, it was precisely because Attorney Cheselka had successfully represented Burton on the charges relating to Stonewall's death that Hale chose to retain Attorney Cheselka as his counsel in this case. Hale has not shown that Attorney Cheselka, in fact, had an actual conflict of interest as a result of his prior representation of Burton or that Attorney Cheselka's performance or the result of the trial was adversely affected in any way by any conflict of interest. The record reflects that Attorney Cheselka actively pursued Hale's desired defense strategy.

{¶ 68} Furthermore, the record reflects that Hale knowingly and expressly waived any potential conflict of interest arising from Attorney Cheselka's successive representation of Burton and Hale. Although Hale asserts in his brief that "[t]here is nothing to indicate in the record or otherwise that Attorney Michael Cheselka received informed consent, from either Jermael Burton [or] Isiah Hale, which has to be in writing[,] regarding these issues," this is not correct. After confirming with the trial court that he understood the potential conflict of interest and still wanted Attorney Cheselka to represent him, Hale executed a written waiver, waiving any potential conflicts of interest associated with Attorney Cheselka's continued

representation of him. Attorney Cheselka also signed the waiver. The trial court read the waiver into the record[6] and indicated that the written waiver was made "part of the Court's record" in this case.

**{¶ 69}** Accordingly, Hale's fifth assignment of error is meritless and is overruled.

### Testimony by Hale's Former Defense Attorney

**{¶ 70}** In his fourth assignment of error, Hale contends that the trial court erred by allowing the state to call his former defense counsel, Attorney Lonardo, to testify at trial regarding Hale's claim that his prior lawyers had told him to lie and "change his story." According to Hale, because he did not waive the privilege or give informed consent to the disclosure of his communications with counsel, Attorney Lonardo's testimony violated the attorney-client privilege and Prof.Cond.R. 1.6.

**{¶ 71}** In Ohio, the attorney-client privilege is governed by statute, R.C. 2317.02(A), which provides a "'testimonial privilege, and in cases that are not

---

[6] The written waiver, signed by Hale and Attorney Cheselka, states:

Let it be known:
1. Isiah Hale and Jermael Burton do not have adverse interests in this matter.
2. Mr. Burton faces no jeopardy in this matter as he was acquitted by virtue of a Rule 29 motion.
3. Mr. Burton offered no testimony in that trial.
4. I have sought and received legal advice regarding said potential conflict Code of Conduct Rule 1.9 governs and upon advice of counsel I feel confident and obligated to defendant and represent the interests of Mr. Hale.

Finally, 5. [sic] Mr. Hale waives any and all conflict of interest in this matter.
Sworn this 31st day of July, 2018.

addressed in R.C. 2317.02(A), by common law.'" *Jackson v. Greger*, 110 Ohio St.3d 488, 2006-Ohio-4968, 854 N.E.2d 487, ¶ 7, quoting *State ex rel. Leslie v. Ohio Hous. Fin. Agency*, 105 Ohio St.3d 261, 2005-Ohio-1508, 824 N.E.2d 990, ¶ 18. R.C. 2317.02(A)(1) provides that an attorney shall not testify "concerning a communication made to the attorney by a client in that relation or concerning the attorney's advice to a client." However, the attorney-client privilege is not absolute. It can be waived by the client and is otherwise subject to various exceptions. *State v. Montgomery*, 2013-Ohio-4193, 997 N.E.2d 579, ¶ 24 (8th Dist.), citing *Squire, Sanders & Dempsey, L.L.P. v. Givaudan Flavors Corp.*, 127 Ohio St.3d 161, 2010-Ohio-4469, 937 N.E.2d 533, ¶ 47.

{¶ 72} A client may waive this testimonial privilege by voluntarily revealing the substance of attorney-client communications. If a client "voluntarily reveals the substance of attorney-client communications in a nonprivileged context * * *, the attorney may be compelled to testify on the same subject." R.C. 2317.02(A)(1). Furthermore, "[a] communication is excepted from the attorney-client privilege if it is undertaken for the purpose of committing or continuing a crime or fraud." *State ex rel. Nix v. Cleveland*, 83 Ohio St.3d 379, 383, 700 N.E.2d 12 (1998).

{¶ 73} In this case, Hale testified at length during the May 2011 hearing as to his communications with Attorneys LaRue and Lonardo regarding "the truth" of what had happened and the false "story" he claimed counsel told him he needed to tell police and others in order to obtain the plea deal. Hale claimed that he knowingly made false statements during his April 2010 police interview, on the

advice of counsel, so that he could obtain the plea deal that had been offered by the state. By testifying regarding these communications with counsel, Hale waived any privilege that would have otherwise been associated with them. As a result, Attorney Lonardo could be "compelled to testify" regarding communications "on the same subject" without violating attorney-client privilege. *See, e.g., State v. Houck*, 2d Dist. Miami No. 09-CA-08, 2010-Ohio-743, ¶ 36-38 (once defendant testified concerning the substance of her communication with her former counsel concerning whether to tender a plea, that communication was no longer confidential and privileged and, as such, the trial court did not err in allowing the former attorney to testify concerning that communication); *Meyers, Roman, Friedberg & Lewis v. Malm*, 83 Ohio App.3d 195, 2009-Ohio-2577, 916 N.E.2d 832 (8th Dist.) (client voluntarily waived the attorney-client privilege when he testified that he knowingly made false statements on a trademark application on the advice of counsel).

{¶ 74} In *Houck*, the defendant pled guilty while she was represented by a public defender and then retained private counsel who moved to withdraw her guilty plea prior to sentencing. *Houck* at ¶ 5-6. At the hearing on the motion to withdraw guilty plea, the defendant testified on her own behalf, claiming that her former attorney told her that she had to plead guilty in order to "stay out of jail." *Id.* at ¶ 14-17, 24. The state then called the public defender to testify regarding his representation of the defendant. *Id.* at ¶ 6. He testified that he had not told the defendant that she would likely go to prison if she did not plead guilty, but rather, that she would likely have an opportunity for community control even if she went to

trial and was convicted. *Id.* at ¶ 25. The defendant objected to the public defender's testimony on grounds of attorney-client privilege. *Id.* at ¶ 6. The trial court overruled the objection and the defendant appealed. *Id.* at ¶ 6-7.

{¶ 75} On appeal, the Second District held that the defendant had "unequivocally waived the confidential, privileged nature of her communication with [her former attorney] concerning whether she should plead guilty to the charged offense, when she testified concerning the communication, including what [her attorney] had advised her." *Id.* at ¶ 37. As the court explained:

> [A defendant] may not publish to the world her attorney's advice to her and expect that it will thereafter remain privileged.
>
> A ruling to the contrary would permit anyone, in either criminal or civil litigation, to claim with impunity that she was acting on advice of counsel, without permitting her former counsel to be asked, by adverse parties, whether that was, in fact, counsel's advice. The attorney-client privilege is a shield, to protect the confidentiality of a client's consultation with her attorney, not a sword to facilitate perjury concerning the substance of counsel's advice.

*Id.* at ¶ 37-38.

{¶ 76} Hale also contends that Attorney Lonardo's testimony violated Prof.Cond.R. 1.6. The duty of confidentiality set forth in Prof.Cond.R. 1.6 places ethical restrictions on a lawyer's disclosure of information relating to the representation of the client. Pursuant to Rule 1.6(a), "[a] lawyer shall not reveal information relating to the representation of a client, including information protected by the attorney-client privilege under applicable law, unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out

the representation," or the disclosure is otherwise permitted or required by the rule. (Emphasis deleted.)

{¶ 77} "[V]iolations of the Rules of Professional Conduct," however, "have no bearing on the admissibility of evidence." (Emphasis deleted.) *Montgomery*, 2013-Ohio-4193, 997 N.E.2d 579, at ¶ 36. Furthermore, under Prof.Cond.R. 1.6(b), a lawyer may reveal information relating to the representation of a client, including information protected by the attorney-client privilege under applicable law, to the extent the lawyer reasonably believes necessary "to respond to allegations in any proceeding * * * concerning the lawyer's representation of the client," Prof.Cond.R. 1.6(b)(5), and "to comply with other law or a court order," Prof.Cond.R. 1.6(b)(6); *see also* Prof.Cond.R. 1.6, Comment 10 ("Where a legal claim or disciplinary charge alleges complicity of the lawyer in the conduct of a client or a former client or other misconduct of the lawyer involving representation of the client or a former client, the lawyer may respond to the extent the lawyer reasonably believes necessary to establish a defense. Such a charge can arise in a civil, criminal, disciplinary, or other proceeding and can be based on a wrong allegedly committed by the lawyer against the client or on a wrong alleged by a third person, for example, a person claiming to have been defrauded by the lawyer and client acting together. The lawyer's right to respond arises when an assertion of such complicity has been made. Division (b)(5) does not require the lawyer to await the commencement of an action or proceeding that charges such complicity, so that the defense may be established by responding directly to a third party who has made such an assertion. The right to defend also

applies, of course, where a proceeding has been commenced."). In this case, Attorney Lonardo had been subpoenaed to testify by the state and was responding to allegations made by Hale in this case that he had told Hale to lie to police and the court in order to obtain a plea deal.

{¶ 78} Accordingly, the trial court did not err in allowing Attorney Lonardo to testify regarding Hale's claim that Attorney Lonardo had told him to lie to police and the court regarding the events leading up to the shooting. Hale's fourth assignment of error is overruled.

**Sufficiency of the Evidence and Manifest Weight of the Evidence**

{¶ 79} In his first and second assignments of error, Hale contends that the trial court erred in denying his Crim.R. 29 motion for acquittal and that his convictions or guilty findings for murder, involuntary manslaughter, aggravated robbery, having weapons while under disability and perjury lacked sufficient evidence and were against the manifest weight of the evidence. Although they involve different standards of review, because they involve interrelated issues, many of the same arguments and a review of the same evidence, we address Hale's first and second assignments of error together.

{¶ 80} A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 13. Accordingly, we review a trial court's denial of a defendant's motion for acquittal using the same standard we apply when reviewing a sufficiency-of-the-evidence challenge. *Id.*

{¶ 81} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state met its burden of production. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41. When reviewing sufficiency of the evidence, an appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In a sufficiency inquiry, an appellate court does not assess whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25; *Jenks* at paragraph two of the syllabus.

{¶ 82} In contrast to a challenge based on sufficiency of the evidence, a manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "thirteenth juror" and may disagree "with the factfinder's resolution of * * * conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1977), citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility and determine

whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). In conducting such a review, this court remains mindful that the credibility of witnesses and the weight of the evidence are matters primarily for the trier of fact to assess. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

### Murder, Aggravated Robbery and Having a Weapon While Under Disability[7]

{¶ 83} Hale was convicted of murder in violation of R.C. 2903.02(B). R.C. 2903.02(B) states: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." The underlying felony for the murder charge was aggravated robbery in violation of R.C. 2911.01(A)(1). That provision states: "No

---

[7] Hale also argues that the jury's guilty finding on involuntary manslaughter was not supported by sufficient evidence and was against the manifest weight of the evidence. Because (1) we find that Hale's conviction for murder was supported by sufficient evidence and was not against the manifest weight of the evidence, (2) that offense merged with the murder charge and (3) the state elected to have Hale sentenced on the murder charge, we need we need not address the jury's finding of guilt as to involuntary manslaughter. *See, e.g., State v. Brown*, 8th Dist. Cuyahoga No. 106532, 2019-Ohio-1235, ¶ 46, fn. 4, citing *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14.

person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it."

{¶ 84} Hale contends that his conviction for murder lacked sufficient evidence and was against the manifest weight of the evidence because Hale proved that he was acting in self-defense when shooting Stonewall. Hale argues that the fact that gunshot primer was found on Stonewall's right hand means that Hale "was clearly shot at first" and that Hale "acted only after his own life was put in jeopardy." Hale further contends that there is "no credible, reliable evidence" that Hale "ever intended to cause the death of another short of acting in self-defense."

{¶ 85} Hale argues that the jury's guilty finding on the aggravated robbery charge was not supported by sufficient evidence and was against the manifest weight of the evidence because "Santiago's story is flawed." Hale argues that Santiago's testimony that he "just sits there" while Hale "jumps in the back seat of their car and tries to rob [Santiago and Stonewall]" is "not credible" and "of no value" because "if he or Stonewall [did] not have a gun as he claims," there is no explanation for "how * * * gunshot residue end[ed] up on Stonewall's hand."

{¶ 86} Hale contends that his conviction for having a weapon while under disability was not supported by sufficient evidence and was against the manifest weight of the evidence because "the only reason [he] had a gun that night was that

he wrestled it away from Santiago." R.C. 2923.13(A)(3) provides, in relevant part: "[N]o person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse." Hale argues that because he testified that he merely took the gun away from Santiago when Santiago "pulled a gun" on him, he did not "knowingly acquire, have, carry, or use any firearm" within the meaning of R.C. 2923.13(A)(3).

{¶ 87} As an initial matter we note that Hale's self-defense argument goes to the manifest weight of the evidence rather than sufficiency of the evidence. *See, e.g., State v. Colon*, 8th Dist. Cuyahoga No. 106031, 2018-Ohio-1507, ¶ 16 ("When reviewing a claim by a defendant that evidence supports his claim of self-defense, the manifest-weight standard is the proper standard of review because a defendant claiming self-defense does not seek to negate an element of the offense charged but rather seeks to relieve himself from culpability."); *see also State v. Dykas*, 185 Ohio App.3d 763, 2010-Ohio-359, 925 N.E.2d 685, ¶ 18 (8th Dist.). Self-defense is an affirmative defense that a defendant must prove by a preponderance of the evidence. R.C. 2901.05(A); *State v. Goff*, 128 Ohio St.3d 169, 2010-Ohio-6317, 942 N.E.2d 1075, ¶ 36. To prevail on a claim of self-defense, a defendant must prove: (1) the defendant was not at fault in "creating the situation giving rise to the affray"; (2) the defendant had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that the only means of escape from such danger was through

the use of force and (3) the defendant did not violate any duty to retreat or avoid the danger. *State v. Callahan*, 2016-Ohio-2934, 65 N.E.3d 155, ¶ 25 (8th Dist.), citing *Barnes*, 94 Ohio St.3d at 24, 759 N.E.2d 1240. The elements of self-defense are cumulative; if a defendant fails to prove any one of the elements by a preponderance of the evidence, the defendant failed to demonstrate that he or she acted in self-defense. *See, e.g., State v. Owens*, 8th Dist. Cuyahoga No. 98165, 2012-Ohio-5887, ¶ 12, citing *State v. Williford*, 49 Ohio St.3d 247, 551 N.E.2d 1279 (1990). Likewise, credibility issues go to manifest weight, not sufficiency of the evidence.

{¶ 88} This case came down to which version of events — and which witnesses — the jury found to be more credible: Hale's trial testimony and the version of events to which he testified at trial or the testimony and version of events to which other witnesses testified. "The decision whether, and to what extent, to believe the testimony of a witness is 'within the peculiar competence of the factfinder, who has seen and heard the witness.'" *State v. Nitsche*, 2016-Ohio-3170, 66 N.E.3d 135, ¶ 45 (8th Dist.), quoting *State v. Johnson*, 8th Dist. Cuyahoga No. 99822, 2014-Ohio-494, ¶ 54. "'When an appellant attacks the credibility of a witness on manifest weight grounds, it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact which accepted the testimony of such witness unless the reviewing court finds that a reasonable [factfinder] could not find the testimony of the witness to be credible.'" *State v. Brown*, 10th Dist. Franklin No. 02AP-11, 2002-Ohio-5345, ¶ 10, quoting *State v. Long*, 10th Dist. Franklin No. 96APA04-511, 1997 Ohio App. LEXIS 416, 25 (Feb. 6, 1997).

{¶ 89} It is well established that a factfinder may believe and convict a defendant based upon the testimony of a single eyewitness, including a victim. *See, e.g., State v. Martin*, 8th Dist. Cuyahoga No. 90722, 2008-Ohio-5263, ¶ 32-42 (rejecting argument that convictions were against the manifest weight of the evidence because the victim, who was the sole eyewitness to the events, gave conflicting information to police officers and there was no corroborating evidence, such as other witnesses or physical evidence); *see also State v. Payne*, 8th Dist. Cuyahoga No. 105965, 2018-Ohio-1399, ¶ 24, 29-30; *State v. Mansour*, 11th Dist. Trumbull No. 2011-T-0013, 2011-Ohio-5438, ¶ 16-29.

{¶ 90} Hale admitted that he fired the shot that killed Stonewall. He argues that the fact that Stonewall was found to have gunshot primer residue on his right hand compels a finding that Stonewall shot at him first and that Hale acted in self-defense in shooting Stonewall. However, that is not the only reasonable conclusion that could be drawn from that evidence. As Jones testified, when gunshot primer residue is found on an individual's hand it could mean that the individual shot a gun; however, it could also mean that the individual was in close proximity to the discharge of a gun or that the individual came into contact with a surface that had gunshot primer residue on it and there was a transfer of gunshot primer residue from that surface to the person's hand. In this case, all of the witnesses testified that Hale was getting out of the rear seat of Stonewall's vehicle or standing just outside Stonewall's vehicle when he shot at Stonewall. Jones testified that one of the bullets went through the driver's seat in which Stonewall was sitting at the time of the

shooting. Douglas and Santiago testified that after Stonewall was shot, they moved Stonewall to the backseat so that Douglas could take over driving to the hospital. Based on this evidence, the jury could have reasonably found that Stonewall was in close proximity to the discharge of the gun or came into contact with a surface that had gunshot primer residue on it, e.g., the driver's seat, and that there was a transfer of gunshot primer residue from that surface to Stonewall's right hand and not that Stonewell shot at Hale.

{¶ 91} Santiago testified that when Hale got into the backseat of Stonewall's car, he said, "give it up," and pulled out a gun. In the statements Hale made during the April 2010 police interview, to the probation officer for the PSI and to the federal judge during his supervised release violation hearing, Hale admitted that he had a gun when he got into Stonewall's car. No witnesses — other than Hale — testified to seeing Stonewall or Santiago with a gun that evening. Bailey, who knew none of the persons involved, testified that she saw someone get out of the car and fire approximately three shots in the direction of the car before running off.

{¶ 92} The evidence presented at trial was sufficient for the jury to find beyond a reasonable doubt that Hale had a prior felony conviction for drug trafficking and had "knowingly acquire[d], ha[d], carr[ied], or use[d] any firearm." R.C. 2923.13(A)(3). Likewise, the evidence presented at trial was sufficient for the jury to find beyond a reasonable doubt that Hale, "in attempting * * * a theft offense * * * or in fleeing immediately after the attempt" had used a "deadly weapon," R.C.

2911.01(A)(1), and had "cause[d] the death of another as a proximate result of * * * attempting to commit" aggravated robbery, R.C. 2903.02(B).

{¶ 93} Although Hale contends that his trial testimony was more credible than Santiago's and that the jury should have, therefore, believed his trial testimony over Santiago's trial testimony, the jury was not required to do. The jury heard multiple different "stories" from Hale regarding what had occurred that evening, including the story he told police in the April 2010 interview, the statements Hale made to the probation officer for the PSI, the statements he made to the federal judge during his supervised release violation hearing, his testimony at the hearing on his motion to withdraw his guilty plea and, finally, his trial testimony. The jury was entitled to disbelieve Hale's trial testimony and to believe the testimony of the other witnesses.

### Perjury

{¶ 94} Hale also asserts that his conviction for perjury was not supported by sufficient evidence and was against the manifest weight of the evidence. Once again, we disagree.

{¶ 95} R.C. 2921.11(A) states: "No person, in any official proceeding, shall knowingly make a false statement under oath or affirmation, or knowingly swear or affirm the truth of a false statement previously made, when either statement is material." A falsification is "material," if "regardless of its admissibility in evidence, * * * it can affect the course or outcome of the proceeding." R.C. 2921.11(B). It is "no defense * * * that the offender mistakenly believed a falsification to be

immaterial." *Id.* For purposes of a conviction under R.C. 2921.11(A), proof of falsity cannot "rest[] solely upon contradiction by testimony of one person other than the defendant."

{¶ 96} Contrary to Hale's assertions, it was not Hale's statements at the change of plea hearing, i.e., his admission that he committed involuntary manslaughter in shooting Stonewall, that gave rise to his perjury conviction. Rather, it was Hale's testimony during the May 2011 hearing on his motion to withdraw his guilty plea. The state introduced excerpts of the transcript from that hearing into evidence. At that hearing — an "official" judicial "proceeding" — Hale testified "under oath" that Attorneys LaRue and Lonardo told him to "change his story" regarding what had occurred on the night of Stonewall's shooting, including that he should say that the transaction involved cocaine rather than marijuana; that he went to the scene to "mediate a drug deal gone bad" when, in "truth," he just happened to be flagged down by Douglas when he arrived at the scene; that Hale shot Stonewall with his own weapon he brought to the scene, when in "truth," he shot Stonewall with a gun he "wrestled" away from Santiago; and that Hale fired the first (and only) shots, when, in "truth," Stonewall shot first.

{¶ 97} Hale's testimony at the May 2011 hearing is in direct conflict with Attorney Lonardo's testimony that he never told Hale to lie "in any way, shape, or form" or to otherwise "change his story" regarding what had occurred. Hale's May 2011 testimony also contradicted his own prior statements regarding the events leading up to Stonewall's shooting, including his statements to police in the April

2010 interview — which was played in full for the jury — his statements to the probation officer reported in the PSI — excerpts of which were introduced into evidence — and his statements to the federal court judge during Hale's supervised released violation hearing — excerpts of which were introduced into evidence. Hale's trial testimony was also in conflict in material respects with testimony by Santiago, Douglas and Burton regarding what occurred that evening. Sufficient, competent credible evidence exists in the record from which the jury could have found beyond a reasonable doubt that Hale knowingly gave false testimony at the hearing on his motion to withdraw his guilty plea.

{¶ 98} After reviewing the entire record, weighing the evidence and all reasonable inferences and considering the credibility of the witnesses, we cannot say that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that Hale's convictions and guilty findings were against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Hale's convictions and guilty findings were both supported by sufficient evidence and were not against the manifest weight of the evidence. Accordingly, Hale's first and second assignments of error are overruled.

**Imposition of Consecutive Sentences**

{¶ 99} In his sixth and final assignment of error, Hale contends that the trial court "did not make the appropriate findings to justify a consecutive sentence."

{¶ 100} In order to impose consecutive sentences, the trial court must find that (1) consecutive sentences are necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public and (3) at least one of the following applies:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4).

{¶ 101} The trial court must make the required statutory findings at the sentencing hearing and incorporate those findings into its sentencing journal entry. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, syllabus. To make the requisite "findings" under the statute, "'the [trial] court must note that it engaged in the analysis' and that it 'has considered the statutory criteria and

specifie[d] which of the given bases warrants its decision.'" *Id.* at ¶ 26, quoting *State v. Edmonson*, 86 Ohio St.3d 324, 326, 1999-Ohio-110, 715 N.E.2d 131. When imposing consecutive sentences, the trial court is not required to give a "talismanic incantation of the words of the statute." *Bonnell* at ¶ 37. "[A]s long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Id.* at ¶ 29.

{¶ 102} Hale does not identify the specific finding(s) which he contends the trial court failed to make or whether this alleged error occurred at the sentencing hearing or in the trial court's sentencing journal entry. However, the record reflects that the trial court conducted the necessary analysis and made the requisite findings for imposing consecutive sentences at the sentencing hearing. When sentencing Hale, the trial court expressly found that consecutive sentences were "necessary to protect the public from future crime" and "to punish" Hale, R.C. 2929.14(C)(4), that "consecutive sentences are not disproportionate to [Hale's] conduct and to the danger [Hale] poses to the public," R.C. 2929.14(C)(4), that Hale's "history and criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by [Hale]," R.C. 2929.14(C)(4)(c), and that Hale was "on Federal Parole at the time he committed these offenses," R.C. 2929.14(C)(4)(a).

{¶ 103} In its August 15, 2018 sentencing journal entry, however, although the trial court incorporated the findings it made at the sentencing hearing that consecutive sentences were necessary to protect the public from future crime and to

punish Hale, R.C. 2929.14(C)(4), and that consecutive sentences are not disproportionate to Hale's conduct and to the danger Hale poses to the public, R.C. 2929.14(C)(4), it did not incorporate its findings at the sentencing hearing that Hale's "history and criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by [Hale]," R.C. 2929.14(C)(4)(c), or that Hale was "on Federal Parole at the time he committed these offenses," R.C. 2929.14(C)(4)(a). Instead, the trial court made a different finding in support of the imposition of consecutive sentences, i.e., that "at least two of the multiple offenses were committed in this case as part of one or more courses of conduct, and the harm caused by said multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of defendant's conduct," R.C. 2929.14(C)(4)(b).

{¶ 104} A trial court cannot make findings in its sentencing journal entry that were not made at the sentencing hearing. However, this failure does not render the consecutive sentences contrary to law. *Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, at ¶ 30 ("A trial court's inadvertent failure to incorporate the statutory findings in the sentencing entry after properly making those findings at the sentencing hearing does not render the sentence contrary to law."). It is simply a clerical mistake that can be corrected through a nunc pro tunc entry to reflect what actually occurred at the sentencing hearing. *Id.* Hale's sixth assignment of error is sustained in part and overruled in part.

{¶ 105} We affirm Hale's consecutive sentences but remand for the trial court to issue a nunc pro tunc order correcting the consecutive sentence findings made in its August 15, 2018 sentencing journal entry to conform to the consecutive sentence findings it made at the sentencing hearing.

{¶ 106} Judgment affirmed; remanded for the issuance of a nunc pro tunc order correcting the trial court's August 15, 2018 sentencing journal entry.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry out this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence and for the issuance of a nunc pro tunc sentencing journal entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

MARY EILEEN KILBANE, A.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR