[Cite as *State v. Miller*, 2021-Ohio-2924.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,                 :

                          No. 109130

    v.                                  :

CHARLES MILLER,                         :

    Defendant-Appellant.                :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 26, 2021

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-626389-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Carson Strang, Eben McNair and Brandon Summers, Assistant Prosecuting Attorneys, *for appellee.*

Joseph V. Pagano, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Defendant-appellant Charles Miller ("Miller") appeals his convictions for aggravated murder, aggravated robbery, murder, felonious assault and two counts of having weapons while under disability along with the firearm specifications in violation of R.C. 2941.145(D) on the convictions for aggravated

murder, murder and aggravated robbery. Miller assigns six errors for our review. For the reasons set forth below, we overrule his assignments of error and affirm the judgment of the trial court.

## I.    Factual and Procedural Background

{¶ 2}   On October 11, 2017, Miller bought a blue Mercury Grand Marquis from Center Road Auto and presented his driver's license with an address of 610 Mohawk Street Roswell, Georgia during the purchase. On October 27, 2017, Miller drove the blue Mercury to Steelyard Commons to meet Timothy Settles who drove a black SUV.

{¶ 3}   That same day, Ronald Constant and Amy Jones visited Steelyard Commons together to go to the Burlington Coat Factory. As Constant walked out of the Burlington Coat Factory, he saw an SUV in the parking lot. The engine was running and a man was seated in the driver's seat. Constant also saw someone in the passenger seat. He could discern that the passenger was tall but not what the driver and passenger were doing.

{¶ 4}   Jones testified that she could see a white man and a black man in the SUV. She would later identify the white man as Miller. Police would later identify the black man as Settles. Jones testified that the black man appeared to be asleep. She observed Miller going through a backpack.

> [Miller] was going through the bag and I see like tools and stuff coming out of the bag * * *. Then I seen him reach other to the driver's side and looked like he was going through his pockets.
>
> * * *

Q. Could you actually see what his hands were doing at the moment?

A. Just looked like he was in pockets because he was in front of him, reached over in front of him. Looked like he was going through his pockets.

Q. Did you see him take anything from the person of the black male?

A. Only thing I seen him take was the bag.

**{¶ 5}** Jones asked Constant not to leave the parking lot because it "didn't look right." Jones stepped out of Constant's car and walked to the SUV and tapped on the window.

The black person didn't move so I opened up the door and noticed that the * * * SUV was still running. And I looked over and I seen a little hole and a little blood come out of his nose.

Q. Just now you were using your index finger on the right side of your face and head. Is that what you saw on that person in the driver's seat?

A. Yes.

Q. And you saw a hole on the right side of his head?

A. Yes.

Q. And something dripping from it?

A. Yes. Something dripping from his nose.

Q. When you say you saw something dripping from the hole on the side of his head was that blood?

A. It looked like blood and maybe tissue and the blood coming out of his nose.

* * *

Q. If you recall did anyone else join you at that driver's door while this was happening?

A.  Some young lady came out of the store because once I opened up the car door, I was like, wow, this guy is dead.  And then she walked over and she touched on him and she said he was.

{¶ 6}  At this point, according to Jones, Miller drove the blue car "up the hill."  Jones later picked out a photograph of Miller from a photo array and identified him as the person she saw in the SUV and driving away in the blue car.

{¶ 7}  Constant, in addition to other bystanders, called police.

{¶ 8}  Officers Goellner and Taylor responded to a call of "unresponsive male in his vehicle."  They arrived after paramedics had pronounced Settles deceased.  The officers secured the scene, moved nearby vehicles and canvassed bystanders for potential witnesses. Cleveland Police Department Homicide Unit detectives, including Detective Kevin Fischbach, arrived on the scene.  The police towed the SUV, with Settles still in it, to the office of the Cuyahoga County Medical Examiner.

{¶ 9}  Miller's temporary license tags were visible on security video obtained from Steelyard Commons.  However, the actual license number was not legible.  Detective Fischbach testified that he caused specialists to download the history of Settles' cellular phone.  Settles' cellular phone records included calls shortly before his death from a specific number.  Detective Fischbach determined that the phone number was associated with Miller's Facebook account.  Detective Fischbach also testified that the investigation determined that Settles was dealing drugs and Fischbach observed suspected narcotics on the driver's side of the vehicle.

{¶ 10} Following the discovery of Miller's Facebook account, Jones identified Miller in a photo array as the "white man" she saw in the Burlington Coat Factory parking lot.

{¶ 11} Several months after the shooting, Miller returned to Center Road Auto and traded the Grand Marquis for a Ford Ranger truck. However, due to issues with the title, the dealership took the truck back and returned the Mercury to Miller which Miller sold in Chattanooga, Tennessee.

{¶ 12} Cuyahoga County Deputy Medical Examiner, Andrea McCollom, testified that:

> A. * * * [t]he wound is to the right temple right above the ear. And it goes in through the scalp and through the underlying skull and basically goes just right to left. And I recovered the bullet right above the ear on the left side.
>
> * * *
>
> Q. Now, path and trajectory of the bullet wound you can describe the path of travel, but there are certain things you cannot conclude about the head position at the time the wound was received; is that correct?
>
> A. Yes.
>
> Q. And why is that?
>
> A. Well, the head pivots and so its position — because there's no evidence of any other injuries one of the things we look for is fouling and stippling. Fouling — when a gun goes off, a lot of things come out of the muzzle of the gun. One of those things is burned gun powder, so soot, and that's called fouling. So you'd see black soot on the surface of the skin.
>
> Another thing is stippling and that's unburned gun powder that comes out of the end of the gun and strikes the skin and causes an abrasion.

And so we look for those things on the body. So you can either see it directly around a wound or you can see it on parts of the body that are in proximity to that part — the body part where the gunshot goes in.

I did not see any fouling or stippling anywhere on his body. So that means that either there was an intervening target, the most common intervening target is clothing, so if there's something deposited on the clothing that he was wearing. Or the gun is so far away that those things fall away and just the bullet makes it to the skin.

* * *

So, when those things are deposited, so soot, it's light and airy and it doesn't go very far. But the powder, the unburned gun powder is a little bit heavier so it will be propelled a little bit farther.

Basically for handguns just in general that's about 12-inches [f]or soot and up to three feet for the powder.

It's different for every gun. In order to know exactly how far that — what that gun's properties are you have to test-fire the gun itself which we would do at our office.

{¶ 13} McCollom also testified that the wound would have caused immediate incapacitation and death. Finally, McCollom testified that she did not rule the shooting accidental or suicidal because there was no fouling or stippling evidence on Settles' body. Thus, the evidence suggested that the gun was fired a moderate distance away from Settles.

{¶ 14} Curtiss Jones, supervisor of the trace evidence department at the Cuyahoga County Medical Examiner's Office, testified that there was no indication that any bullet struck the exterior of the vehicle. Jones recovered a spent cartridge casing from the inside of the vehicle. Jones ran a trace metal detection test on the hands of Settles, but the test was negative which, he testified, suggests that Jones likely did not handle a metal object shortly before his death. A cell phone was also

recovered from the SUV. Settles' pockets were turned out when investigators arrived at the scene. As a result, DNA samples were taken from Settles' front right pocket opening, front left pocket opening and the rear right pocket. Jones authenticated photographs that showed the center console of the vehicle with its lid raised and suspected bags of drugs in the driver's armrest.

{¶ 15} Additionally, Settles' hair contained no observable powder grains, which suggests a short distance of four to five feet. Jones testified that the state's theory that Miller shot Settles while Miller sat in the passenger seat was consistent with the forensic evidence.

{¶ 16} Jeffrey Oblock, a forensic scientist in the DNA department of the Cuyahoga County Regional Forensic Science Laboratory testified that DNA swabs from the left front pocket and the right rear pocket matched the Defendant as did swabs taken from the passenger door interior handle and door pull of Settles' vehicle.

{¶ 17} Steelyard Commons security officer Zachary Holliday was dispatched to a Party City store the next day to retrieve an unattended and abandoned backpack which was left in their store. It was later discovered that the bag contained drug paraphernalia. Steelyard security officers, recalling that the suspect in the shooting the day before had been seen with a backpack, turned the backpack over to a Cuyahoga County special deputy who works security at Steelyard Commons and she submitted it to the Cleveland Police Department.

{¶ 18} Settles' mother testified that he carried a backpack at all times. However, no witness at trial identified the recovered backpack as belonging to Settles.

{¶ 19} Keith Curtin, a detective for the Medina County Sheriff's Office, testified that he executed a search warrant for a suspected residence of Miller in connection with a separate investigation in Medina County. The search of the residence recovered a ZTE cellular phone, which was identified by serial number. Sometime later, Curtin obtained a password for the phone.

{¶ 20} William Davidson, an intelligence analyst for the FBI testified that he examined the ZTE phone retrieved by Detective Curtin and determined that there was an app downloaded to the phone that was preventing the FBI's software from downloading the contents of the phone. There were two phone numbers associated with this phone. One of those phone numbers was the number Detective Fischbach found in Settles' call history and that was associated with Miller's Facebook account.

{¶ 21} Todd Wiles testified as a crime analyst for the Cleveland Police Department. Wiles was able to determine that the ZTE phone called Settles' phone at 12:23 p.m. on October 27, 2017 and that "just before 2:00 Mr. Miller calls out to Settles and then Settles calls back to Miller * * *." Furthermore, the cellular phone service provider's data showed both phones were within the proximity of Steelyard Commons at the time in question.

{¶ 22} Fischbach testified that Miller's phone records indicated that Miller searched the internet for information on the status of the Steelyard shooting.

Fischbach also found two Facebook messages from an account owned by "Tony Miller" and that the defendant's full name is Charles Anthony Miller. In the first message, Miller stated that "[y]ou have to know me to know me. Get it? Unless they show a booking mug shot, people can speculate all they want. It's not me in that photo. Anyhow, I love you, man * * *." In a subsequent Facebook posting, Tony Miller wrote "[s]tarting with, yeah, I saw it. And they're blowing it way out of proportion. I'm a lot of things but a killer of drug dealers is for sure not one of them. I've never seen, even hear of the guy * * *."

{¶ 23} Miller was arrested in Georgia on February 23, 2018, at the address listed on the driver's license he had provided when he purchased his vehicle. During his detention, the state intercepted a letter he wrote laying out his version of events. Essentially, Miller admitted that he was in Settles' car, but contended that he was assisting Settles by trying to fix a handgun and while doing so, the weapon malfunctioned, exploded and killed Settles.

{¶ 24} Following a series of motions requesting continuances and motions filed pro se wherein Miller discharged counsel, indicated his desire to proceed pro se and ultimately requested new counsel be appointed, this case was tried to a jury commencing August 21, 2019. The jury returned a verdict of guilty on all counts submitted to them and the trial court found Miller guilty of counts six and seven that were tried to the court. The trial court sentenced Miller to a life sentence for Count 1 (aggravated murder) with parole eligibility after 30 years and 54 months for the firearm specification. The court also sentenced Miller to 11 years on Count 3

(aggravated robbery), and 36 months on each of Counts 6 and 7. The 54-month firearm specification term was ordered to be served consecutively. All other terms were ordered to be served concurrently. Counts 2, 4 and 5 merged into Counts 1 and 3. Miller was advised as to a term of five years mandatory postrelease control on Count 3 and three years of discretionary postrelease control on Counts 6 and 7. Miller appeals and assigns six errors for our review.

> ASSIGNMENT OF ERROR I: APPELLANT'S CONSTITUTIONAL AND STATUTORY RIGHTS WERE VIOLATED WHEN THE CHARGES WERE NOT DISMISSED WHEN HE WAS NOT BROUGHT TO TRIAL TRIED WITHIN THE STATUTORY TIME PERIOD FOR SPEEDY TRIAL.

## 1. Ohio's Speedy Trial Act

{¶ 25} Ohio law requires that "[a] person against whom a charge of felony is pending * * * [s]hall be brought to trial within two hundred seventy days after the person's arrest." R.C. 2945.71(C)(1). Further, "each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days." R.C. 2945.71(E).

{¶ 26} "Our review of a trial court's decision on a motion to dismiss for a speedy trial violation involves a mixed question of law and fact. We accord due deference to a trial court's findings of fact if supported by competent, credible evidence but determine independently if the trial court correctly applied the law to the facts of the case. Furthermore, when reviewing the legal issues presented in a speedy trial claim, we must strictly construe the relevant statutes against the state." *Cleveland v. Jeric*, 8th Dist. Cuyahoga No. 89687, 2008-Ohio-1825, ¶ 19.

{¶ 27} First, Miller contends that the speedy trial time should start from the date of his arrest in Georgia. However, "Where the prosecution did not unreasonably delay extradition, arrest in another state on an Ohio warrant and confinement awaiting extradition does not count toward the speedy trial clock and the time is tolled until the defendant arrives in Ohio." *State v. Wilson*, 8th Dist. Cuyahoga No. 107926, 2019-Ohio-2741, ¶ 10 (internal quotations omitted.)

{¶ 28} Miller does not point to any evidence that would support the conclusion that the state unreasonably delayed his extradition. As a result, the first day charged against the state of Ohio is after Miller was transferred into the custody of the state of Ohio. According to Miller, "Appellant was in [Cuyahoga County] jail on March 14, 2018." Thus, Miller's first day of arrest was March 14, 2018 under Ohio's Speedy Trial Act.

### a. Continuances of Defense Counsel Prior to Miller's Motion to Dismiss

{¶ 29} Following Miller's extradition to Ohio, defense counsel requested a series of continuances from March 29, 2018 to September 27, 2018. "'[A] defendant's right to be brought to trial within the time limits expressed in R.C. 2945.71 may be waived by his counsel for reasons of trial preparation and the defendant is bound by the waiver even though the waiver is executed without his consent.'" *State v. Williams*, 8th Dist. Cuyahoga No. 100898, 2014-Ohio-4475, ¶ 59 (quoting *State v. McBreen*, 54 Ohio St.2d 315, 376 N.E.2d 593 (1978), syllabus).

{¶ 30} "Only if the defendant can show that the continuances were unreasonable might a court consider disallowing them for purposes of speedy trial

calculation." *State v. Harris*, 8th Dist. Cuyahoga No. 108377, 2020-Ohio-5425, ¶ 26.

{¶ 31} Here, Miller makes no argument that any of these continuances were unreasonable nor does he point to any evidence in the record that could support the conclusion that the requests for continuances were unreasonable. At best, Miller provides his unsupported statement that the continuances are unreasonable.

{¶ 32} These continuances are similar to *Harris*. Much like Harris, Miller faced a potential life sentence, significant forensic evidence and does not support his claim that the continuances were unreasonable "beyond his mere statements." *Harris*, 2020-Ohio-5425, ¶ 26. Thus, Miller has not shown that the trial court erred by not counting the time of these continuances for the purposes of speedy trial calculation.

### b. Miller's Pro Se Motions

{¶ 33} The only argument advanced by Miller that any of the continuances were unreasonable arises after Miller filed a motion to represent himself as well as requesting a psychiatric exam to determine whether he was competent to stand trial.

{¶ 34} Miller avers that: "Rather than seeking continuances, counsel should have asked the court to address Mr. Miller's pending motion to remove them as his attorneys. Instead, counsel waited until January 4, 2019, and informed the court they had been unable to prepare for trial or have any meaningful conversations with Mr. Miller since the motion had been filed in September of 2018."

{¶ 35} Miller filed a motion to disqualify and remove counsel on September 24, 2018. Two days later, Miller filed two more motions: first, a motion to dismiss the indictment based on speedy trial violations and second, a motion for a psychological exam.

{¶ 36} The trial court granted Miller's motion for a psychiatric exam on October 31, 2018. The trial court reasonably determined that it needed to resolve the request for a psychiatric examination before considering Miller's request to represent himself. The trial court granted Miller's motion to represent himself on December 27, 2018. However, one week later, Miller moved to have counsel reinstated. The court granted Defendant's oral motion for appointment of new counsel at a hearing on January 4, 2019. At that hearing, Defendant expressly agreed to the continuance of the trial date but reserved his rights to raise arguments relying on the previous continuances. This waiver was executed in writing and continued to the trial.

{¶ 37} Miller's claim of a speedy trial violation, therefore, rests on the time between when Miller filed his pro se motions and on January 4, 2019 when Miller agreed to move the trial date in order to retain new counsel.

{¶ 38} "[T]he time within which an accused must be brought to trial is tolled from the date the accused files a motion challenging his or her competency to stand trial." *State v. Palmer*, 84 Ohio St.3d 103, 103, 702 N.E.2d 72 (1998). That tolling "continues until the trial court makes a competency determination[.]" *Palmer*, 84 Ohio St.3d at 103. Thus, Miller's motion for a psychiatric evaluation on

September 24, 2018 tolled the time under the statute. Similarly, Miller's motion to remove his counsel and allow him to proceed pro se tolled the time within which Miller must be brought to trial. *State v. Johnson*, 8th Dist. Cuyahoga No. 106532, 2019-Ohio-3178, ¶ 17.

{¶ 39} Miller argues that "[t]he trial court's delay in ruling on the motion to disqualify should not be charged against appellant as the law required it to be ruled on expeditiously." However, the trial court determined it should first rule on Miller's motion requesting a psychiatric examination. Only after the report did not provide anything that contradicted the presumption of competency, did the trial court consider whether Defendant could represent himself at trial. Miller makes no argument and points to no evidence that suggests that the consideration of the motion for a psychiatric examination was unreasonably delayed or that the psychiatric examination itself was unreasonably delayed.

{¶ 40} The trial court reasonably decided that it needed to determine Miller's competency before ruling on his motion to remove his attorneys and allow him to proceed pro se. Because of the time spent on the psychiatric examination, it was not until December 27, 2018 that the trial court found Miller had waived his right to counsel and had the right to defend himself.

### c. Calculation of Speedy Trial Days

{¶ 41} As noted above, Miller's date of arrest is March 14, 2018 for the purposes of Ohio's Speedy Trial Act. Defense counsel's first request for a continuance was on March 29, 2018. This counts as 15 days from the arrest.

{¶ 42} The days between December 27, 2018 (when the trial court granted Appellant's motion to proceed pro se) and January 4, 2019 (when Miller asks for counsel to be reassigned) adds a further eight days, making Miller's total time awaiting trial 23 days.

{¶ 43} Even supposing that Miller is correct and his time should count from his arrest in Georgia (February 23, 2018), this adds only 19 days bringing the total to 42 days. Adding the time from when Miller filed a motion asking for a psychiatric examination to when the court ordered Miller to be examined by the court's psychiatric clinic increases the total by 35 days for a total of 77 days. Indeed, Miller makes no argument whatsoever that the trial court's consideration of the motion for a psychiatric examination was unduly delayed nor that the examination itself was unduly delayed.

{¶ 44} Miller is well short of showing that he was incarcerated awaiting trial for more than 90 days as counted under the statute.

### 2. Constitutional Right to a Speedy Trial

{¶ 45} Our review of a challenge of a constitutional speedy trial violation also presents a mixed question of law and fact. *State v. Barnes*, 8th Dist. Cuyahoga No. 90847, 2008-Ohio-5472, ¶ 19. "In examining a constitutional claim on speedy trial grounds, the statutory time requirements of R.C. 2945.71 to 2945.73 are not relevant; instead, courts should employ the balancing test enunciated by the United States Supreme Court[.]" *State v. Cochern*, 8th Dist. Cuyahoga No. 104960, 2018-Ohio-265, ¶ 47 (citing *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2181, 33 L.Ed.2d

101 (1972)). The Supreme Court identified the balancing test factors as: 1) the length of the delay; 2) the reason the government assigns to justify the delay; 3) whether and how the defendant asserts his right; and 4) prejudice to the defendant. *Barker*, 407 U.S. at 531-32.

{¶ 46} Here, we have little difficulty in finding that the trial court did not err in denying Miller's motion to dismiss based on his constitutional right to a speedy trial. The initial delays were occasioned by motions of defense counsel. Presumably, these continuances were needed to prepare for trial. Defendant produced no argument or evidence to show that the continuances were unreasonable. Further, the next delay was occasioned by Miller moving for a psychiatric examination and for the right to proceed pro se. After those motions were resolved, Miller himself consented to a delay in order to retain new counsel. Miller then executed written waivers to extend the trial date so that new counsel had the time needed to prepare for trial.

{¶ 47} Miller's claim that the continuances sought by defense counsel were unreasonable fails because Miller provides no basis for the court to conclude that the original defense counsel did not need the time to prepare for trial. Indeed, when new counsel was assigned, they sought, with written agreement of Miller, continuances for that very reason. Further, Miller's own motion occasioned the delay with respect to the need to determine Miller's competency.

{¶ 48} Accordingly, Miller has not shown that the trial court erred by denying his motion to dismiss on the grounds that he was denied his right to a speedy trial. We overrule Miller's first assignment of error.

> ASSIGNMENT OF ERROR II: APPELLANT WAS DEPRIVED OF SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND HIS RIGHT TO A FAIR TRIAL WAS VIOLATED WHEN THE COURT FAILED TO GRANT A MISTRIAL.

{¶ 49} Miller points to two events that he believes establish error. In one, Miller contends that a mistrial should have been declared and, in another, Miller contends that counsel below were constitutionally ineffective insofar as they failed to move for a mistrial. The first concerns an outburst from an unidentified person sitting in the gallery. The second arises from the prosecution's effort to elicit testimony from an investigating officer.

{¶ 50} "[A] trial court must determine, as a question of fact, whether an emotional outburst in a murder trial deprived the defendant of a fair trial by improperly influencing the jury. In the absence of clear, affirmative evidence to the contrary, the trial court's determination will not be disturbed." *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 44 (citations and quotations omitted). "[U]nless there is clear evidence in the record showing the outburst affected the jury, only the trial judge can determine whether the jury was disturbed, alarmed, shocked or moved by the incident or whether the outburst was of such a nature that it necessarily influenced the verdict." *State v. Roman*, 8th Dist. Cuyahoga No. 92743, 2010-Ohio-3593, ¶ 22 (quotations omitted).

**{¶ 51}** The first incident to which appellant points is as follows:

[Counsel]: We make a motion for a mistrial based on the outburst from I believe the victim's family that yelled in front of the jury that our client was a — something like a rotten murderer who killed a man in a wheelchair and had to be escorted out of the room.

We feel that's a[n] unfairly prejudicial type of victim impact. It's been placed in front of the jury. So for the record we'd make a motion.

* * *

The Court: The motion is denied. [The outburst] was very short. I'm not sure how much the jury could hear. The deputies were talking over her as she was talking as was I, so I'm not sure anything was even heard by the jurors. And I would be happy to give a curative instruction. If you would like to consider that over the lunch hour I will give it or formulate my own. Whatever you wish.

* * *

The Court: All right. We're back on the record but the jury is not in. The defense had an opportunity to discuss what they would like as a curative instruction regarding someone in the gallery speaking out, about the outburst.

It's my understanding the defense does not [] want a curative instruction.

[Counsel]: Judge, it's our belief we would just draw further attention to it by bringing it up. That in no way waives or diminishes our motion for mistrial and I understand what the law is generally on curative instruction. Then we've doubled it rather than left it alone.

We would understand the court's ruling when you denied our motion for mistrial but we feel a curative instruction would draw attention.

The Court: All right. I will not give a curative instruction.

[State]: And can the record reflect that the defendant was present for this discussion?

The Court: Yes.

{¶ 52} Here, much like the *Roman* case, the record does not indicate precisely what the offending outburst was. *Roman*, 2010-Ohio-3593, at ¶ 21 ("the record does not indicate what language was contained in the outburst * * * it does indicate defense counsel's interpretation of what the language was, but the record is devoid of any specific language aired in court.").

{¶ 53} Appellant contends that this court should reverse this case based on *State v. Beckwith*, 8th Dist. Cuyahoga No. 97318, 2012-Ohio-3076. In *Beckwith*, the defendant engaged in the crimes of robbery and murder with codefendants. One codefendant testified that another witness had said that the defendant committed the crimes. *Beckwith*, 2012-Ohio-3076, ¶ 21. The *Beckwith* Court concluded that the trial court erred by failing to declare a mistrial based on the "the unique circumstances of this case[.]" *Beckwith*, 2012-Ohio-3076, at ¶ 43.

{¶ 54} The *Beckwith* Court noted that the purely circumstantial nature of the case made the potential prejudice of the outburst greater. In the present case, there was ample evidence that was inconsistent with Miller's claim that the shooting was accidental.

{¶ 55} *Beckwith* also concerned an outburst from a testifying witness. This case concerns an outburst from a person in the gallery and the record neither discloses what was said nor who said it. The record further indicates that the trial court, who witnessed the outburst, considered it doubtful that the jury heard it.

{¶ 56} Miller has not shown that the trial court erred in denying Miller's motion for a mistrial.

{¶ 57} Miller next contends that trial counsel provided ineffective assistance of counsel insofar as they did not move for a mistrial with respect to a question the prosecutor asked the homicide detective.

{¶ 58} The transcript Miller points to reads as follows:

[State]: Do you remember Mr. Lovell telling you that Mr. Miller told him that he didn't have any money at the time and wanted the victim to front him?

[Defense Counsel]: Objection.

[State]: And Settles wouldn't so he had to kill that N*****

[Defense Counsel]: Objection.

The Court: Objection sustained. Please disregard.

[Defense Counsel]: Move to strike.

The Court: Stricken.

{¶ 59} Miller contends that the trial court's instruction to the jury not to speculate on the truth of any suggestion included in a question that was not answered is insufficient and trial counsel rendered ineffective assistance in failing to move for a mistrial.

{¶ 60} The defense actually introduced the evidence of the accusation. The statement was included in a letter written by Miller under an assumed name. Defense counsel produced the letter and asked Fischbach to read the letter. The letter contained Miller's claim that the death of Settles was caused by the malfunction and accidental discharge of Settles' own weapon. In material part, the letter states: "Oh, and there's a guy named Rob Lovell that got picked up on a traffic

violation and to get out of jail he told the detectives that I admitted to him that I killed this guy arguing over money or drugs." In essence, defense counsel used the letter to introduce Miller's side of the story without placing Miller on the stand.

{¶ 61} The prosecution then sought to elicit testimony from Fischbach to confirm that Mr. Lovell did indeed state that Miller confessed to killing Settles. The only additional information contained in the prosecution's question is the allegation that Mr. Lovell accused Miller of making a racial slur.

{¶ 62} The question from the prosecutor was never answered. Accordingly, Miller has not shown that trial counsel engaged in ineffective assistance in not seeking a mistrial on an unanswered question that the trial court struck from the consideration of the jury. Miller does not point to anything in the record that suggests the jury did not comply with the instruction that they "must not draw any inference or speculate on the truth of any suggestions included in a question that was not answered."

{¶ 63} Accordingly, Miller has not shown that trial counsel was ineffective for failing to seek a mistrial with respect to this testimony.

{¶ 64} The second assignment of error is overruled.

> ASSIGNMENT OF ERROR III: THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO RECUSE WHERE THE TRIAL JUDGE WHO SIGNED THE SEARCH WARRANT PRESIDED OVER THE SUPPRESSION HEARING.

{¶ 65} A court of appeals does not have authority to pass upon the disqualification of a trial court judge or to void a judgment on that basis. "The Chief

Justice of the Ohio Supreme Court has the sole authority to disqualify a judge in this state. *See* R.C. 2701.03. That code section requires the party seeking the disqualification of a judge to file an affidavit of prejudice with the Chief Justice as soon as possible after the incident giving rise to the claim of prejudice." *Grogan v. T.W. Grogan Co.*, 143 Ohio App.3d 548, 557, 758 N.E.2d 702 (8th Dist.2001). *See also State v. Dienes*, 8th Dist. Cuyahoga No. 97578, 2012-Ohio-4588, ¶ 14. Accordingly, we are without jurisdiction to consider this assignment of error.

{¶ 66} The third assignment of error is overruled.

ASSIGNMENT OF ERROR IV: APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 67} A manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "thirteenth juror" and may disagree "with the factfinder's resolution of * * * conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1977), citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility and determine whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the

conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 68} In conducting such a review, this court remains mindful that the credibility of witnesses and the weight of the evidence are matters primarily for the trier of fact to assess. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 69} Miller contends that "[n]o one disputed the fact that Settles was shot. The only issue in this case was whether it was an accident."

{¶ 70} Miller concedes that he was present at Steelyard Commons and that he met with Settles on October 27, 2017. However, Miller contends that the manifest weight of the evidence should have prevented the jury from concluding that Miller purposefully killed the decedent.

{¶ 71} Miller's account of the incident in material part is as follows:

> This dude has a pistol and hides it in the broiler in the bottom of the oven. While he is out running around doing whatever it is he's doing that day his woman decides to bake a cake * * * He gets the weapon from the broiler and it's damaged. The grips are distorted from the heat, not melted away, just f***ed up looking. He pulls the slide back to test fire the weapon, the slide jams[.] * * * He asked me if I could look at [the firearm] and I agreed. * * * I meet him at Burlington Coat in the parking lot. * * * I brought a small tool kit I had with me. He's sitting in the driver's seat, I'm in the passenger seat. He's holding the weapon on top of the center console * * * upside down with an extended clip pointing straight up. The business end is pointing toward the back seat. While he is holding the weapon I insert a flathead screwdriver into the bottom of the weapon between the butt and the extended clip

and twist, nothing.  He re-grips and I twist again, much harder this time and the weapon discharges.  When the weapon discharges it also explodes into approximately seven, eight, nine pieces.  * * * So I'm wiping the blood off my forehead and face and picking pieces of this weapon up from the dash, the seat my lap, whatever.  And I'm telling this dude "this is f***ed up" and "did you see that?"  I'm actually talking to this dude for a couple minutes and I ask him where he got this weapon from and when he doesn't answer I'm asking again but starting to look in his direction and I'm like "WHAT THE F***!" * * * I checked his wrist pulse, nothing.  I checked his pulse on the left side of his neck, nothing.  He wasn't breathing.  I was scared now.  I picked up the pieces of the weapon off my lap and zipped them up in my tool kit and exited the vehicle. * * * Oh, and there's a guy named Rob Lovell that got picked up on a traffic violation and to get out of jail he told the detectives that I admitted to him that I killed this guy arguing over money or drugs.

{¶ 72} Essentially, appellant's argument is that the jury should have credited the letter that he produced contending that there was an accidental discharge of a firearm rather than an intentional or knowing killing.

{¶ 73} The letter is itself founded on an act of deception because the letter purports to be written by "James Valenti."  As Miller explained:  "I'm sending this letter in someone else's name [be]cause the prosecutor reads all my mail and copies it."

{¶ 74} The state produced a statement of appellant in which he denied that it was him in a photograph presumably circulated by Cleveland police in addition to a later statement that "I saw the pictures and I can't explain that.  Wrong place wrong time?"  This could support a jury concluding that appellant's recollection of past events had a certain adaptability to present needs.

{¶ 75} There was ample evidence in the record to support the conclusion that Miller purposefully killed Settles.  "A defendant's purpose may be established by

circumstantial evidence. The law has long recognized that intent, lying as it does within the privacy of a person's own thoughts, is not susceptible to objective proof." *State v. Worley*, ___ Ohio St.3d ___, 2021-Ohio-2207, ¶ 64

{¶ 76} The jury could infer from Miller's posture and movements before entering Settles' vehicle that Miller carried a firearm and intended to use it. This would explain why Miller closed the car door with his left hand when his right hand would have been more natural. Miller entered the car without anything visible in his hands. Miller then exited the car carrying a backpack. Nothing in Miller's account of the shooting explained the backpack. The jury could have inferred Miller fired a pistol from within his pocket explaining why there was no fouling or stippling found on Settles. The jury could have concluded that no parts of the exploded firearm were found in the car for the reason that they never existed. The jury could have determined that Settles being shot in the head by a firearm pointing away from him is not a mystery. Rather, they may well have concluded that the bullet struck Settles' head because the gun was pointed at his head and the gun was pointed at Settles' head because Miller intended to shoot Settles. "[W]here an inherently dangerous instrumentality was employed, a homicide occurring during the commission of a felony is a natural and probable consequence presumed to have been intended. Such evidence is sufficient to allow a jury to find a purposeful intent to kill." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 137.

{¶ 77} Amy Jones testified that the defendant appeared to be rifling the pockets of Settles. Miller's DNA was found in samples taken from Settles' pockets. Miller claimed that he had only been taking Settles' pulse. This does not explain, however, how Miller's DNA came to be found in Settles' rear pocket. Moreover, Miller rifling Settles' pockets is entirely consistent with the state's theory that Miller intended to murder and rob Settles. Additionally, Miller's statement is inconsistent with the fact that the vehicle's console was found open by investigators.

{¶ 78} Miller's account also did not explain the phone records reflecting that he had called Settles shortly before the shooting. Nor does it explain why he picked up every piece of Settles' alleged exploded firearm rather than preserve those pieces as proof of an accident. Further, Miller's account does not explain why he immediately tried to dispose of, or exchange, the blue Grand Marquis and moved to Georgia. Miller had a Georgia driver's license but his phone was found in a property in Medina County, Ohio. Miller stated in one of the Facebook messages that he was in Elkhart, Indiana training to be a pilot, yet he was arrested in Georgia. He also denied knowing Settles while later writing a letter stating that he specifically went to the parking lot at Settles' request. A juror certainly could have concluded that Miller was being less than honest and could have inferred purposeful intent from his extensive efforts to avoid detection. *Worley*, 2021-Ohio-2207, ¶ 70 ("extensive efforts to escape detection, including lying [support the conclusion that defendant] purposely murdered [the victim]").

{¶ 79} We cannot say that the jury lost its way in concluding that Miller purposely killed Settles.

{¶ 80} We overrule Miller's fourth assignment of error.

ASSIGNMENT OF ERROR V: THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR ACQUITTAL UNDER CRIM.R. 29 BECAUSE THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO ESTABLISH BEYOND A REASONABLE DOUBT THE ELEMENTS NECESSARY TO SUPPORT THE CONVICTIONS.

{¶ 81} A Crim.R. 29 motion for acquittal tests the sufficiency of the evidence. Accordingly, we review a trial court's denial of a defendant's motion for acquittal using the same standard we apply when reviewing a sufficiency-of-the-evidence challenge. *State v. Hale*, 8th Dist. Cuyahoga No. 107646, 2019-Ohio-3276, ¶ 80 (citations omitted).

{¶ 82} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state met its burden of production. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41. When reviewing sufficiency of the evidence, an appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In a sufficiency inquiry, an appellate court does not assess whether the state's evidence is to be believed but whether, if believed, the

evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25; *Jenks* at paragraph two of the syllabus.

{¶ 83} The only argument presented by Miller in this assignment of error is that the state did not present sufficient evidence to establish the mens rea elements of each and all of the crimes and specifications "beyond a reasonable doubt" for the reasons that are set forth in assignment of error IV.

{¶ 84} There was ample evidence in the record to support the inference that Miller purposely killed Settles.

{¶ 85} Accordingly, we overrule Miller's fifth assignment of error.

ASSIGNMENT OF ERROR VI: THE TRIAL COURT ERRED BY DENYING APPELLANT'S REQUEST FOR A RECKLESS HOMICIDE JURY INSTRUCTION.

{¶ 86} A charge on a lesser included offense is only required where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense. *State v. Collins*, 8th Dist. Cuyahoga No. 95415, 2011-Ohio-3241, ¶ 35, citing *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286 (1988), paragraph two of the syllabus. The court must view the evidence in the light most favorable to the defendant when deciding whether to instruct the jury on a lesser included offense. *State v. Campbell*, 69 Ohio St.3d 38, 630 N.E.2d 339 (1994). An instruction is not warranted, however, every time "some evidence" is presented on a lesser included offense. *State v. Smith*, 8th Dist. Cuyahoga No. 90478, 2009-Ohio-2244, ¶ 12, citing *State v. Shane*, 63 Ohio St.3d 630, 590 N.E.2d 272 (1992).

{¶ 87} A trial court has discretion in determining whether the record contains sufficient evidentiary support to warrant a jury instruction on a lesser included offense; we will not reverse that determination absent an abuse of discretion. *State v. Rucker*, 2018-Ohio-1832, 113 N.E.3d 81, ¶ 67 (8th Dist.).

{¶ 88} Here, the trial court did instruct the jury on the lesser included offense of negligent homicide.

{¶ 89} The only evidence in the record that could support a conviction for reckless homicide is the letter produced by Miller in which Miller denied ever having had possession of the firearm but instead claimed that he was trying to pry out the extended magazine from the magazine well of the pistol with a slotted screwdriver, while Settles maintained physical control of the firearm. Certainly, nothing in this account is consistent with the verdict of the jury that Miller displayed, brandished or used the firearm to facilitate the offense.

{¶ 90} The jury convicted Miller of aggravated murder an element of which is that Miller purposely, and with prior calculation and design, caused the death of Settles. The jury also found Miller guilty of firearm specifications finding that Miller possessed a firearm "while committing the offense and displayed the firearm, brandished the firearm, indicated that he possessed the firearm, or used it to facilitate the offense." R.C. 2941.145. The verdict of the jury is inconsistent with Miller's claim of recklessness in its conviction of Miller for aggravated murder, the gun specifications and aggravated robbery.

{¶ 91} Thus, there can be no reversible error on the court's decision to give only a lesser included offense instruction of negligent homicide. *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 139 (jury verdict's other interrogatory answers inconsistent with the requested instruction demonstrate defendant was not prejudiced by refusal to give requested instruction).

{¶ 92} Further, the trial court's decision that Miller's account of events sounded in negligence rather than recklessness was not an abuse of discretion. Nothing in Miller's account suggested that he knew or should have known that the bullet would be projected towards the driver rather than in the direction that the firearm was pointed. *See* R.C. 2901.22(C) (statutory definition of recklessness). The trial court reasonably determined that the correct lesser included charge was for negligence should the jury credit Miller's account of events. Miller has not shown that the trial court abused its discretion in refusing to instruct the jury on the charge of reckless homicide.

{¶ 93} Accordingly, we overrule Miller's sixth assignment of error.

## II. Conclusion

{¶ 94} For the foregoing reasons, we overrule Miller's assignments of error and affirm the judgment of the trial court.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having

been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
EMANUELLA D. GROVES, J., CONCUR